# JAMA *v.* IMMIGRATION AND CUSTOMS ENFORCEMENT

No. 03–674.   Argued October 12, 2004—Decided January 12, 2005

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, KENNEDY, and THOMAS, JJ., joined. SOUTER, J., filed a dissenting opinion, in which STEVENS, GINSBURG, and BREYER, JJ., joined, *post*, p. 352.

*Jeffrey J. Keyes* argued the cause for petitioner. With him on the briefs was *Kevin M. Magnuson.*

*Malcolm L. Stewart* argued the cause for respondent. With him on the brief were *Acting Solicitor General Clem-*

*ent, Assistant Attorney General Keisler, Deputy Solicitor General Kneedler, Donald E. Keener, and Greg D. Mack.*

JUSTICE SCALIA delivered the opinion of the Court.

When an alien is found ineligible to remain in the United States, the process for selecting the country to which he will be removed is prescribed by 8 U. S. C. § 1231(b)(2). The question in this case is whether this provision prohibits removing an alien to a country without the explicit, advance consent of that country's government.

I

Petitioner Keyse Jama was born in Somalia and remains a citizen of that nation. He was admitted to the United States as a refugee, but his refugee status was terminated in 2000 by reason of a criminal conviction. See *Jama* v. *INS*, 329 F. 3d 630, 631 (CA8 2003). The Immigration and Naturalization Service (INS) brought an action to remove petitioner from the United States for having committed a crime involving moral turpitude. *Ibid.;* see 8 U. S. C. §§ 1182(a)(2)(A)(i)(I), 1229a(e)(2)(A). In the administrative hearing, petitioner conceded that he was subject to removal, although he sought various forms of relief from that determination (adjustment of status, withholding of removal, and asylum relief under the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment). He declined to designate a country to which he preferred to be removed. The Immigration Judge ordered petitioner removed to Somalia, his country of birth

---

*Briefs of *amici curiae* urging reversal were filed for International Human Rights Organizations et al. by *Jonathan L. Hafetz* and *Lawrence S. Lustberg;* and for Yusuf Ali Ali et al. by *Thomas L. Boeder* and *Nicholas P. Gellert.*

*Daniel J. Popeo* and *Richard A. Samp* filed a brief for the Washington Legal Foundation et al. as *amici curiae* urging affirmance.

and citizenship. The Board of Immigration Appeals affirmed that determination, and petitioner did not seek review in the Court of Appeals.

Instead, petitioner instituted collateral proceedings under the habeas statute, 28 U. S. C. § 2241, to challenge the designation of Somalia as his destination. He filed his petition in the United States District Court for the District of Minnesota, alleging that Somalia has no functioning government, that Somalia therefore could not consent in advance to his removal, and that the Government was barred from removing him to Somalia absent such advance consent. The District Court agreed that petitioner could not be removed to a country that had not consented in advance to receive him, *Jama* v. *INS*, Civ. File No. 01–1172 (JRT/AJB) (Mar. 31, 2002), p. 10, App. to Pet. for Cert. 51a, but a divided panel of the Court of Appeals for the Eighth Circuit reversed, holding that § 1231(b)(2) does not require acceptance by the destination country, 329 F. 3d, at 633–635. We granted certiorari. 540 U. S. 1176 (2004).

## II

Title 8 U. S. C. § 1231(b)(2), which sets out the procedure by which the Attorney General[1] selected petitioner's destination after removal was ordered, was enacted as follows:

"(2) OTHER ALIENS.—Subject to paragraph (3)—

"(A) SELECTION OF COUNTRY BY ALIEN.—Except as otherwise provided in this paragraph—

---

[1] On March 1, 2003, the Department of Homeland Security and its Bureau of Border Security assumed responsibility for the removal program. Homeland Security Act of 2002, §§ 441(2), 442(a), 116 Stat. 2192–2194, 6 U. S. C. §§ 251(2), 252(a) (2000 ed., Supp. II). Accordingly, the discretion formerly vested in the Attorney General is now vested in the Secretary of Homeland Security. See § 551(d)(2). Because petitioner's removal proceedings, including the designation of Somalia as the country of removal, occurred before this transfer of functions, we continue to refer to the Attorney General as the relevant decisionmaker.

"(i) any alien not described in paragraph (1) who has been ordered removed may designate one country to which the alien wants to be removed, and

"(ii) the Attorney General shall remove the alien to the country the alien so designates.

"(B) LIMITATION ON DESIGNATION.—An alien may designate under subparagraph (A)(i) a foreign territory contiguous to the United States, an adjacent island, or an island adjacent to a foreign territory contiguous to the United States as the place to which the alien is to be removed only if the alien is a native, citizen, subject, or national of, or has resided in, that designated territory or island.

"(C) DISREGARDING DESIGNATION.—The Attorney General may disregard a designation under subparagraph (A)(i) if—

"(i) the alien fails to designate a country promptly;

"(ii) the government of the country does not inform the Attorney General finally, within 30 days after the date the Attorney General first inquires, whether the government will accept the alien into the country;

"(iii) the government of the country is not willing to accept the alien into the country; or

"(iv) the Attorney General decides that removing the alien to the country is prejudicial to the United States.

"(D) ALTERNATIVE COUNTRY.—If an alien is not removed to a country designated under subparagraph (A)(i), the Attorney General shall remove the alien to a country of which the alien is a subject, national, or citizen unless the government of the country—

"(i) does not inform the Attorney General or the alien finally, within 30 days after the date the Attorney General first inquires or within another period of time the Attorney General decides is reasonable, whether the government will accept the alien into the country; or

"(ii) is not willing to accept the alien into the country.

"(E) ADDITIONAL REMOVAL COUNTRIES.—If an alien is not removed to a country under the previous subparagraphs of this paragraph, the Attorney General shall remove the alien to any of the following countries:

"(i) The country from which the alien was admitted to the United States.

"(ii) The country in which is located the foreign port from which the alien left for the United States or for a foreign territory contiguous to the United States.

"(iii) A country in which the alien resided before the alien entered the country from which the alien entered the United States.

"(iv) The country in which the alien was born.

"(v) The country that had sovereignty over the alien's birthplace when the alien was born.

"(vi) The country in which the alien's birthplace is located when the alien is ordered removed.

"(vii) If impracticable, inadvisable, or impossible to remove the alien to each country described in a previous clause of this subparagraph, another country whose government will accept the alien into that country.

"(F) REMOVAL COUNTRY WHEN UNITED STATES IS AT WAR.—When the United States is at war and the Attorney General decides that it is impracticable, inadvisable, inconvenient, or impossible to remove an alien under this subsection because of the war, the Attorney General may remove the alien—

"(i) to the country that is host to a government in exile of the country of which the alien is a citizen or subject if the government of the host country will permit the alien's entry; or

"(ii) if the recognized government of the country of which the alien is a citizen or subject is not in exile, to a country, or a political or territorial subdivision of a country, that is very near the country of which the alien is a citizen or subject, or, with the consent of the govern-

ment of the country of which the alien is a citizen or subject, to another country." Immigration and Nationality Act, § 241(b)(2), as added by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), § 305(a)(3), 110 Stat. 3009–600.

The statute thus provides four consecutive removal commands: (1) An alien shall be removed to the country of his choice (subparagraphs (A) to (C)), unless one of the conditions eliminating that command is satisfied; (2) otherwise he shall be removed to the country of which he is a citizen (subparagraph (D)), unless one of the conditions eliminating that command is satisfied; (3) otherwise he shall be removed to one of the countries with which he has a lesser connection (clauses (i) to (vi) of subparagraph (E)); or (4) if that is "impracticable, inadvisable, or impossible," he shall be removed to "another country whose government will accept the alien into that country" (clause (vii) of subparagraph (E)). Petitioner declined to designate a country of choice, so the first step was inapplicable. Petitioner is a citizen of Somalia, which has not informed the Attorney General of its willingness to receive him (clause (i) of subparagraph (D)), so the Attorney General was not obliged to remove petitioner to Somalia under the second step. The question is whether the Attorney General was precluded from removing petitioner to Somalia under the third step (clause (iv) of subparagraph (E)) because Somalia had not given its consent.

## A

We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest. In all of subparagraph (E), an acceptance requirement appears only in the terminal clause (vii), a clause that the Attorney General may invoke only after he finds that the removal options presented in the

other six are "impracticable, inadvisable, or impossible." Clauses (i) through (vi) come first—in the statute and in the process of selecting a country. And those six clauses contain not a word about acceptance by the destination country; they merely direct that "the Attorney General shall remove the alien" to any one of them.

Effects are attached to nonacceptance throughout the rest of paragraph (2), making the failure to specify any such effect in most of subparagraph (E) conspicuous—and more likely intentional. Subparagraph (C) prescribes the consequence of nonacceptance in the first step of the selection process; subparagraph (D) does the same for the second step; and clause (vii) of subparagraph (E) does the same for the fourth step.[2] With respect to the third step, however, the Attorney General is directed to move on to the fourth step only if it is "impracticable, inadvisable, or impossible to remove the alien to each country described in" the third step. Nonacceptance may surely be one of the factors considered in determining whether removal to a given country is impracticable or inadvisable, but the statute does not give it the dispositive effect petitioner wishes.

Petitioner seizes upon the word "another" in clause (vii) as a means of importing the acceptance requirement into clauses (i) through (vi). He argues that if the last resort country is "*another* country whose government will accept the alien," then the countries enumerated in clauses (i) through (vi) must *also* be "countries whose governments will accept the alien." That stretches the modifier too far.

_____

[2] The dissent contends that there are only three steps, with all of subparagraph (E) constituting only a single step, and that clause (vii)'s acceptance requirement therefore covers the entire subparagraph. *Post*, at 353, n. 2 (opinion of SOUTER, J.). We think not. Clause (vii) applies only after the options set out in the third step are exhausted; it is nothing if not a discrete, further step in the process. That step four is a separate clause rather than a separate subparagraph is immaterial: Step one, which is indisputably set out in *three* subparagraphs, belies the dissent's theory that steps must precisely parallel subparagraphs.

Just last Term, we rejected an argument much like petitioner's, noting that it ran contrary to "the grammatical 'rule of the last antecedent,' according to which a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Barnhart* v. *Thomas*, 540 U. S. 20, 26 (2003). There, a statute referred first to a claimant's "previous work" and then to "any other kind of substantial gainful work which exists in the national economy"; under the rule of the last antecedent, we declined to read the limiting clause "which exists in the national economy" into the term "previous work." *Id.*, at 26–28 (emphasis deleted; internal quotation marks omitted); accord, *FTC* v. *Mandel Brothers, Inc.*, 359 U. S. 385, 389–390 (1959). We thus did not treat "any other" as the "apparently connecting modifier" that the dissent here thinks "another" to be, *post*, at 355.[3]

---

[3] Indeed, both "other" and "another" are just as likely to be words of *differentiation* as they are to be words of connection. Here the word "another" serves simply to rule out the countries already tried at the third step and referred to in the conditional prologue of clause (vii) ("If impracticable, inadvisable, or impossible to remove the alien to each country described in a previous clause of this subparagraph, another country . . . "). It is the fact of that close earlier reference that makes it natural to say "another country" here, whereas "[a] country" is used at the outset of § 1231(b)(1)(C)(iv), in which the reference to "each country described in a previous clause of this subparagraph" comes later and hence cannot serve as an antecedent for "another." The dissent makes a mountain of this molehill, see *post*, at 356–357.

The dissent also finds profound meaning in the fact that Congress changed the text from "any country" in the 1996 legislation to "another country" in the current version. "The Court cannot be right," it says, "in reducing the 1996 amendment to this level of whimsy." *Post*, at 358. But if one lays the pre-1996 version of the statute beside the current version, he will find *numerous* changes that are attributable to nothing more than stylistic preference. To take merely one example: Clause (E)(ii) of the current law, which reads "The country in which is located the foreign port from which the alien left for the United States or for a foreign territory contiguous to the United States," previously read "the country in which is located the foreign port at which such alien embarked for the United

Nor does the structure of subparagraph (E) refute the inference derived from the last antecedent rule. Each clause is distinct and ends with a period, strongly suggesting that each may be understood completely without reading any further.[4] And as we have already noted, it is not necessary to turn to the acceptance language of clause (vii) to find the conditions under which the Attorney General is to abandon the third step and move to the fourth, the last resort option of any willing country. The Attorney General must do so if in his judgment it would be "impracticable, inadvisable, or impossible to remove the alien to each country described in" clauses (i) to (vi). This allows the Attorney General to take both practical and geopolitical concerns into account when selecting a destination country (and accords with the similar flexibility to pass over inappropriate countries that the statute gives the Attorney General at the other steps, see *infra*, at 348). Petitioner's reading would abridge that exercise of executive judgment, effectively deeming the removal of an alien to any country to be *per se* "impracticable, inadvisable, or impossible" absent that country's advance acceptance, even though in many cases—such as this one—it is nothing of the sort. (Removing an alien to Somalia apparently involves no more than putting the alien on one of the regularly

States or for foreign contiguous territory." 8 U. S. C. § 1253(a)(2) (1994 ed.). The dissent must explain why these changes were insignificant whereas the change from "any country" to "another country" was a momentous limitation upon executive authority.

[4] By contrast, in the cases on which the dissent relies to rebut the last antecedent inference, see *post*, at 354–356, the structure cut the other way: The modifying clause appeared not in a structurally discrete statutory provision, but at the end of a single, integrated list—for example, "'receives, possesses, or transports in commerce or affecting commerce.'" *United States* v. *Bass*, 404 U. S. 336, 337, 339 (1971); see also *United States* v. *Standard Brewery, Inc.*, 251 U. S. 210, 218 (1920); *United States* v. *United Verde Copper Co.*, 196 U. S. 207, 213 (1905). We do not dispute that a word is known by its fellows, but here the structure refutes the premise of fellowship.

scheduled flights from Dubai or Nairobi, and has been accomplished a number of times since petitioner's removal proceeding began. App. 36–40 (declaration of detention enforcement officer Eric O'Denius).) Even without advance *consultation*, a country with a functioning government may well accept a removed alien when he is presented at the border or a port of entry; the absence of advance *consent* is hardly synonymous with impracticability or impossibility.[5]

### B

Petitioner contends that even if no acceptance requirement is explicit in the text, one is manifest in the entire structure of § 1231(b)(2). The Attorney General may not remove an alien to a country under subparagraph (A) or (D) without that country's consent, petitioner reasons, so he must be barred from circumventing that limitation by removing the same alien to the same country under subparagraph (E). The dissent rests its argument only on the existence of an acceptance requirement in step two (subparagraph (D)) and not in step one (subparagraphs (A) through (C)).[6]

---

[5] The Government argued below that even if clauses (i) through (vi) of subparagraph (E) require some form of consent, the destination country's acceptance of the alien at the port of entry suffices. Brief for Respondent-Appellant in No. 02–2324 (CA8), pp. 43–46; *Jama* v. *INS*, Civ. File No. 01–1172 (JRT/AJB) (D. Minn., Mar. 31, 2002), p. 14, App. to Pet. for Cert. 54a. Because clauses (i) through (vi) contain no acceptance requirement, we need not pass on petitioner's contention that when § 1231(b)(2) requires acceptance, only *advance* acceptance will do.

[6] The dissent asserts that we misdescribe petitioner's argument when we say it rests on both steps one and two. *Post*, at 364, and n. 10. We note that petitioner heads the relevant argument "The Plain Language Of The Statute Requires Acceptance *At Every Step*," Brief for Petitioner 23 (emphasis added), and concludes his description of the country-selection process with the assertion that "[t]he outer limit of the Attorney General's authority, . . . which circumscribes the selection of *any country*, is that the government of the country of removal must be willing to accept the alien," *id.*, at 18 (emphasis added); see also *id.*, at 19–20.

We note initially a point that applies to both petitioner's and the dissent's positions: The "circumvention" argument requires that the country the Attorney General selects at step three—here, the country of birth under clause (iv)—also be the country of citizenship that was disqualified at step two for failure to accept the alien. That will sometimes be true, yet the reason step three exists at all is that it will not *always* be true. (Indeed, in petitioner's case, several of the clauses of subparagraph (E) describe Kenya, not Somalia.) Despite this imperfect overlap, petitioner and the dissent seek to impose an acceptance requirement on *all* removals under step three, in the name of preventing the Attorney General from "circumventing" step two in the cases where a step-three country is also the country of citizenship.

The more fundamental defect in petitioner's argument, which appeals to a presumed uniformity of acceptance requirement throughout § 1231(b)(2), is that its premise is false. It is simply not true that the Attorney General may not remove an alien to a country under subparagraph (A) or (D) without that country's consent. Subparagraph (C) specifies that the Attorney General "may disregard" the alien's subparagraph (A) designation if the designated country's government proves unwilling to accept the alien or fails to respond within 30 days. The word "may" customarily connotes discretion. See, *e. g.*, *Haig* v. *Agee*, 453 U. S. 280, 294, n. 26 (1981). That connotation is particularly apt where, as here, "may" is used in contraposition to the word "shall": The Attorney General "shall remove" an alien to the designated country, except that the Attorney General "may" disregard the designation if any one of four potentially countervailing circumstances arises. And examining those four circumstances reinforces the inappropriateness of reading "may" to mean "shall" in subparagraph (C): Would Congress really have wanted to preclude the Attorney General from removing an alien to his country of choice, merely because that country took 31 days rather than 30 to manifest its ac-

ceptance? (Subparagraph (C), unlike subparagraph (D), offers no "reasonable time" exception to the 30-day rule.) Petitioner insists that a lack of advance acceptance is an absolute bar to removal, but offers no plausible way of squaring that insistence with the text of subparagraph (C).[7]

Nor does the existence of an acceptance requirement at the fourth and final step create any structural inference that such a requirement must exist at the third. It would be a stretch to conclude that merely because Congress expressly directed the Attorney General to obtain consent when removing an alien to a country with which the alien lacks the ties of citizenship, nativity, previous presence, and so on, Congress must also have *implicitly* required him to obtain advance acceptance from countries with which the alien *does* have such ties. Moreover, if the Attorney General is unable to secure an alien's removal at the third step, all that is left is the last resort provision allowing removal to a country with which the alien has little or no connection—if a country can be found that will take him. If none exists, the alien is left in the same removable-but-unremovable limbo as the aliens in *Zadvydas* v. *Davis*, 533 U. S. 678 (2001), and *Clark* v. *Martinez, post,* p. 371, and under the rule announced in those cases must presumptively be released into American

---

[7] The same incompatibility may exist with regard to subparagraph (D), which prescribes that the Attorney General "shall remove the alien" to his country of citizenship "unless" that country's government declines to accept the alien or fails to manifest its acceptance within a reasonable time. The Government urges that the two exceptions preserve discretion for the Attorney General: If one of those conditions exists, the Attorney General is no longer required to remove the alien to that country, but he *may* still do so. We need not resolve whether subparagraph (D) affords this residual level of discretion; subparagraph (C) is more than enough to demonstrate that an acceptance requirement does not pervade the selection process in the way petitioner claims, and other factors suffice to refute the dissent's more limited contention. Rejection of the Government's argument is essential, however, to the dissent's position, see *post,* at 365–368—and the proper resolution is far from clear.

society after six months.   If this is the result that obtains when the country-selection process fails, there is every reason to refrain from reading restrictions into that process that do not clearly appear—particularly restrictions upon the third step, which will often afford the Attorney General his last realistic option for removal.

To infer an absolute rule of acceptance where Congress has not clearly set it forth would run counter to our customary policy of deference to the President in matters of foreign affairs.   Removal decisions, including the selection of a removed alien's destination, "may implicate our relations with foreign powers" and require consideration of "changing political and economic circumstances." *Mathews* v. *Diaz*, 426 U. S. 67, 81 (1976).   Congress has already provided a way for the Attorney General to avoid removals that are likely to ruffle diplomatic feathers, or simply to prove futile.   At each step in the selection process, he is *empowered* to skip over a country that resists accepting the alien, or a country that has declined to provide assurances that its border guards will allow the alien entry.

Nor is it necessary to infer an acceptance requirement in order to ensure that the Attorney General will give appropriate consideration to conditions in the country of removal. If aliens would face persecution or other mistreatment in the country designated under § 1231(b)(2), they have a number of available remedies: asylum, § 1158(b)(1); withholding of removal, § 1231(b)(3)(A); relief under an international agreement prohibiting torture, see 8 CFR §§ 208.16(c)(4), 208.17(a) (2004); and temporary protected status, 8 U. S. C. § 1254a(a)(1).   These individualized determinations strike a better balance between securing the removal of inadmissible aliens and ensuring their humane treatment than does petitioner's suggestion that silence from Mogadishu inevitably portends future mistreatment and justifies declining to remove *anyone* to Somalia.

## C

Petitioner points to what he describes as the "settled construction" of § 1231(b)(2), and asserts that Congress, in its most recent reenactment of the provision, should be deemed to have incorporated that construction into law. We think not. Neither of the two requirements for congressional ratification is met here: Congress did not simply reenact § 1231(b)(2) without change, nor was the supposed judicial consensus so broad and unquestioned that we must presume Congress knew of and endorsed it.

Removal is a new procedure created in 1996 through the fusion of two previously distinct expulsion proceedings, "deportation" and "exclusion." IIRIRA, § 304(a)(3), 110 Stat. 3009–589, 8 U. S. C. § 1229a. Our immigration laws historically distinguished between aliens who have "entered" the United States and aliens still seeking to enter (whether or not they are physically on American soil). See *Leng May Ma* v. *Barber*, 357 U. S. 185, 187 (1958). "The distinction was carefully preserved in Title II" of the Immigration and Nationality Act (INA): expelling an alien who had already entered required a *deportation* proceeding, whereas expelling an alien still seeking admission could be achieved through the more summary exclusion proceeding. *Ibid.*; see *Landon* v. *Plasencia*, 459 U. S. 21, 25–27 (1982) (cataloging differences between the two proceedings). Aliens who, like petitioner, were allowed into the United States as refugees were subject to exclusion proceedings rather than deportation proceedings when their refugee status was revoked. 8 CFR § 207.8 (1995).[8]

---

[8] Petitioner's application for admission was deemed to have been made after his criminal conviction, because he had not applied previously. See 8 U. S. C. § 1159(a)(1) (1994 ed.) (a refugee must appear for "inspection and examination for admission to the United States as an immigrant in accordance with [§ 1227, the former exclusion provision]" one year after entry). The district director conducted petitioner's examination for admission and found him inadmissible by reason of his conviction. Record

The cases on which petitioner relies pertained to the INA's *deportation* provision, the former 8 U. S. C. § 1253 (1952 ed.). *United States ex rel. Tom Man* v. *Murff,* 264 F. 2d 926 (CA2 1959); *Rogers* v. *Lu,* 262 F. 2d 471 (CADC 1958) *(per curiam).*[9] In the two cited cases, the Courts of Appeals barred deportation of aliens to the People's Republic of China, a nation with which the United States at the time had no diplomatic relations, without that nation's prior consent. *Tom Man, supra,* at 928 (reading the acceptance requirement in clause (vii) to cover clauses (i) to (vi) as well); *Rogers, supra,* at 471.[10] During the same period, however, courts—including the Court of Appeals that decided *Tom Man*—were *refusing* to read an acceptance requirement into the exclusion provision, the former 8 U. S. C. § 1227 (1952 ed.). *E. g., Menon* v. *Esperdy,* 413 F. 2d 644, 654 (CA2 1969). Likewise, when Congress amended the exclusion provision to expand the list of possible destinations—adding three new categories and a fourth, last resort provision virtually identical to the last resort provision in current § 1231(b)(2)(E)(vii), see 8 U. S. C. § 1227(a)(2) (1982 ed.)—courts were generally skepti-

_____

97, 99 (Exh. F). This finding, under the pre-1996 law, would have subjected petitioner to expulsion "in accordance with" the exclusion provision, not the deportation provision.

[9] *Rogers* v. *Lu* in fact involved the existence of an acceptance requirement at step *two,* not step three. See *Lu* v. *Rogers,* 164 F. Supp. 320, 321 (DC 1958).

[10] The dissent asserts that the Board of Immigration Appeals adhered to a similar position. *Post,* at 359. With rare exceptions, the BIA follows the law of the circuit in which an individual case arises, see *Matter of K— S—,* 20 I. & N. Dec. 715, 718 (1993); *Matter of Anselmo,* 20 I. & N. Dec. 25, 30–32 (1989). Thus, in a case arising in the Second Circuit, the BIA adhered (in dictum) to that court's decision in *Tom Man.* See *Matter of Linnas,* 19 I. & N. Dec. 302, 306–307 (1985). But in a case decided after *Tom Man* and *Rogers* but not controlled by those decisions, the BIA held to the contrary: "When designating a country in step three as a place of deportation, there is *no requirement* that preliminary inquiry be addressed to the country to which deportation is ordered . . . ." *Matter of Niesel,* 10 I. & N. Dec. 57, 59 (1962) (emphasis added).

cal of efforts to read the acceptance requirement back into the other clauses. *E. g., Walai* v. *INS,* 552 F. Supp. 998, 1000 (SDNY 1982); *Amanullah* v. *Cobb,* 862 F. 2d 362, 369 (CA1 1988) (Aldrich, J., concurring). But see *id.,* at 365, and n. 4 (opinion of Pettine, J.).

In other words, IIRIRA forged the new removal procedure out of two provisions, only one of which had been construed as petitioner wishes.[11] And even the supposed judicial consensus with respect to that one provision boils down to the decisions of two Courts of Appeals—one of which was only a two-sentence *per curiam* that considered step two, not step three. *Rogers, supra,* at 471; see n. 9, *supra.*[12] In the context of new § 1231(b)(2), the acceptance requirement is "neither a settled judicial construction nor one which we would be justified in presuming Congress, by its silence, impliedly approved." *United States* v. *Powell,* 379 U. S. 48, 55, n. 13 (1964) (citation omitted). Even notwithstanding the

---

[11] The dissent's assertion, *post,* at 361–362, that § 1231(b)(2) descends solely from the former deportation provision is, in the relevant respect, erroneous. To be sure, the former exclusion provision has its own exclusive descendant in § 1231(b)(1), but that applies only to aliens placed in removal proceedings immediately upon their arrival at the border, see §§ 1231(b)(1)(A), (c)(1), not to formerly excludable aliens who, like petitioner, were paroled or otherwise allowed into the country. Whereas previously some aliens who had been allowed into the country were excluded and some deported, see §§ 1227(a)(1), 1253(a) (1994 ed.), now all are *removed* and their destination chosen under § 1231(b)(2), not (b)(1). Section 1231(b)(2) is thus a descendant of the exclusion provision as well as the deportation provision, and cases decided under the former represent the relevant prior law no less than cases decided under the latter.

The dissent repeatedly contends that Congress intended to make no substantive change to the prior law when it enacted § 1231(b)(2). *E. g., post,* at 361–362. But on the dissent's view the 1996 amendment worked rather a large change: Refugees like petitioner, who previously could be expelled without acceptance (under former § 1227), now cannot. See n. 8, *supra.*

[12] The additional dicta cited by the dissent, *post,* at 359, do not lend any additional weight to the argument that Congress ratified a settled judicial construction. Dictum settles nothing, even in the court that utters it.

contradictory interpretation of the BIA, see n. 10, *supra*, petitioner's Circuit authority is too flimsy to justify presuming that Congress endorsed it when the text and structure of the statute are to the contrary.[13]

\* \* \*

For the foregoing reasons, the judgment of the Court of Appeals is affirmed.

*It is so ordered.*

JUSTICE SOUTER, joined by JUSTICE STEVENS, JUSTICE GINSBURG, and JUSTICE BREYER, dissenting.

Title 8 U. S. C. § 1231(b) prescribes possible destinations for aliens removable from the United States. Paragraph (1) of that subsection governs aliens found excludable from the United States in the first place, whereas paragraph (2), which is at issue in this case, governs those once admitted for residence but since ordered to be deported (for criminal conduct while here, for example).[1] As to the latter, paragraph (2) sets out three options or successive steps for picking the recipient country. At step one, the alien himself designates the country, § 1231(b)(2)(A), subject to conditions set

---

[13] In his brief on the merits, petitioner raises the additional contention—not presented to, or decided by, the Court of Appeals—that removal to Somalia is impermissible at any step of § 1231(b)(2) because the lack of a functioning central government means that Somalia is not a "country" as the statute uses the term. The question on which we granted certiorari in this case, as phrased by petitioner himself, was as follows: "Whether the Attorney General can remove an alien to one of the countries designated in 8 U. S. C. § 1231(b)(2)(E) without obtaining that country's acceptance of the alien prior to removal." Pet. for Cert. i. That question does not fairly include whether Somalia is a country any more than it fairly includes whether petitioner is an alien or is properly removable; we will not decide such issues today. See this Court's Rule 14.1(a); *Lexecon Inc.* v. *Milberg Weiss Bershad Hynes & Lerach,* 523 U. S. 26, 42, n. 5 (1998).

[1] Paragraph (2) is quoted in the Court's opinion. *Ante,* at 338–341. Paragraph (1) is quoted in an appendix to this dissent. *Infra,* at 369–370.

out in subparagraphs (B) and (C). If no removal to a step-one choice occurs, the Secretary of Homeland Security at step two designates the country of which the alien "is a subject, national, or citizen" as the place to send him. § 1231(b)(2)(D). If no such removal occurs, the Secretary at step three names a country with which the alien has some prior connection, or (as a last resort) one with which he has no connection at all. § 1231(b)(2)(E).[2]

The provision for step three describes six countries with various connections to an alien ("[t]he country in which the alien was born," for example, § 1231(b)(2)(E)(iv)), as well as the choice of last resort, "another country whose government will accept the alien into that country," § 1231(b)(2)(E)(vii). The question is whether not only the seventh, last-resort country but also the prior six are subject to the condition

---

[2] The Court contends that the statute actually contains four steps rather than three, with the third consisting of the first six clauses of subparagraph (E) and the fourth being the seventh clause of that same subparagraph. *Ante*, at 341. But while the seventh clause is in a sense separated from the first six, it seems odd to view them as entirely distinct since Congress saw fit not only to put them in the same subparagraph, but also to limit the scope of the "impracticable, inadvisable, or impossible" phrase in clause (vii) to the countries "described in a previous clause of this subparagraph." 8 U. S. C. § 1231(b)(2)(E)(vii). This difficulty with the Court's reading may explain why no other court has taken a four-step view of the statute and why even the Government describes the law as " 'set[ting] forth a progressive, three-step process for determining a removable alien's destination country.' " Brief for Respondent 5 (quoting *Jama* v. *INS*, 329 F. 3d 630, 633 (CA8 2003)). The Court apparently takes the four-step view so that it can go on to say that three of the four steps, but not step three, expressly address "the consequence of nonacceptance." *Ante*, at 342. (Since it separates clause (vii) from clauses (i)–(vi), the four-step view also makes it easier to undermine Jama's argument that the acceptance requirement in clauses (i)–(vi) is grounded in the text of clause (vii).)

The Court's response that "[s]tep one, which is indisputably set out in three subparagraphs, belies the dissent's theory that steps must precisely parallel subparagraphs," *ante*, at 342, n. 2 (emphasis deleted), misses the mark because that is not in fact my contention.

that the "government will accept the alien into that country." In my judgment, the acceptance requirement applies to all seven; the Court's contrary conclusion is at war with the text, structure, history, and legislative history of the statute, and I respectfully dissent.

### I

The Court remarks that "[w]e do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply." *Ante,* at 341. Indeed we do not, but the question in this case is whether Congress really has left out an acceptance requirement covering the entire "adopted text," that is, the provision governing all seven choices at step three. Jama says that the text contains just that requirement, in the seventh and final clause of § 1231(b)(2)(E). As noted, that clause provides a last possible destination for aliens who cannot (or, in the Government's view, should not) be removed under subparagraphs (A) through (D) or the first six clauses of subparagraph (E); it does so by authorizing removal to "another country whose government will accept the alien," § 1231(b)(2)(E)(vii).

Jama contends that the description of "another" willing country applies an acceptance requirement to clauses (i) through (vi) of the same subparagraph, (E). If Congress had not intended this, it would have written clause (vii) differently, as by saying, for example, "a country whose government will accept the alien" or "any country whose government will accept the alien" or "another country, if that country will accept the alien." Congress, in other words, had some simple drafting alternatives that would not have indicated any intent to attach an acceptance requirement to clauses (i) through (vi), but instead used language naturally read as alluding to a common characteristic of all the countries in the series, a willingness to take the alien. Jama would therefore have us draw the straightforward conclusion that all step-three designations are subject to acceptance by the country selected, just as we have reasoned before when

construing comparable statutory language. *United States* v. *Standard Brewery, Inc.*, 251 U. S. 210, 218 (1920) ("The prohibitions extend to the use of food products for making 'beer, wine, or other intoxicating malt or vinous liquor for beverage purposes.' . . . It is elementary that all of the words used in a legislative act are to be given force and meaning, and of course the qualifying words 'other intoxicating' in this act cannot be rejected. It is not to be assumed that Congress had no purpose in inserting them or that it did so without intending that they should be given due force and effect. The Government insists that the intention was to include beer and wine whether intoxicating or not. If so the use of this phraseology was quite superfluous, and it would have been enough to have written the act without the qualifying words" (citation omitted)).

The Court dodges the thrust of the congressional language by invoking the last antecedent rule as a grammatical reason for confining the requirement of a receiving country's willingness strictly to the seventh third-step option, where it is expressly set out. Under the last antecedent rule, "a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Barnhart* v. *Thomas*, 540 U. S. 20, 26 (2003), quoted *ante*, at 343. If the rule applied here, it would mean that the phrase "whose government will accept . . . " modified only the last choice "country" in clause (vii), to the exclusion of each "country" mentioned in the immediately preceding six clauses, notwithstanding the apparently connecting modifier, "another."

But the last antecedent rule fails to confine the willing-government reference to clause (vii). The rule governs interpretation only "ordinarily," and it "can assuredly be overcome by other indicia of meaning . . . ." *Barnhart, supra*, at 26. Over the years, such indicia have counseled us against invoking the rule (often unanimously) at least as many times as we have relied on it. See *Nobelman* v. *Amer-*

*ican Savings Bank,* 508 U. S. 324, 330–331 (1993); *United States* v. *Bass,* 404 U. S. 336, 340, n. 6 (1971); *Standard Brewery, supra,* at 218 (citing *United States* v. *United Verde Copper Co.,* 196 U. S. 207 (1905)).  And here, the other indicia of meaning point with one accord to applying the acceptance requirement to each third-step option.

The first of these indicia is the contrast between the text of clause (vii), which is the last resort for "deportation," and the wording of the corresponding provision in the adjacent and cognate paragraph of the same subsection that deals with "exclusion."  As the Court explains, *ante,* at 349, the 1996 amendments addressing removal of aliens gathered into one statute prior provisions dealing with the two different varieties of removal: what the earlier law called exclusion, that is, the removal of an excludable alien "with respect to whom [removal] proceedings . . . were initiated at the time of such alien's arrival," § 1231(b)(1), and what the earlier law called deportation, that is, the removal of all other aliens. Exclusion is the sole subject of paragraph (1) of the current statute, while deportation is the sole subject of paragraph (2), the one at issue here.  See *supra,* at 352.

The separate attention to the two classes of removable aliens includes separate provisions for selecting the country to which an alien may be removed.  Paragraph (1) sets out several options for excludable aliens, much as paragraph (2) does for those who are deportable.  And just like the final clause of the final subparagraph of paragraph (2) (clause (vii)), the final clause of the final subparagraph of paragraph (1) provides a last resort that is available when removal of an excludable alien to any of the previously described countries "is impracticable, inadvisable, or impossible." § 1231(b)(1)(C)(iv).  The two last-resort provisions differ in one important way, however.  The provision for deportable aliens in paragraph (2) speaks of "another country whose government will accept the alien into that country," § 1231(b)(2)(E)(vii), while the one for excludable aliens in

paragraph (1) reads, "[a] country with a government that will accept the alien into the country's territory," § 1231(b)(1)(C)(iv). Congress thus used two different words ("another" and "a") in parallel provisions of two immediately adjacent and otherwise similar paragraphs. Whereas "another country" with a willing government is readily read to imply that the country described is like one or more other countries already identified, "a country" with a willing government carries no such implication.

Although this textual difference between simultaneously enacted provisions that address the same subject makes no sense unless Congress meant different things by its different usage, the Court treats the "a country" and "another country" provisions as if they were exactly the same. In doing so, it "runs afoul of the usual rule that 'when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended.'" *Sosa* v. *Alvarez-Machain*, 542 U. S. 692, 711, n. 9 (2004) (quoting 2A N. Singer, Statutes and Statutory Construction § 46:06, p. 194 (6th ed. 2000)); accord, *United States* v. *Gonzales*, 520 U. S. 1, 5 (1997) ("'Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion'"); *Russello* v. *United States*, 464 U. S. 16, 23 (1983) ("We refrain from concluding here that the differing language in the two subsections has the same meaning in each. We would not presume to ascribe this difference to a simple mistake in draftsmanship"). Jama's contrasting interpretation, which I would adopt, is consistent with Congress's distinct choices of words.[3]

---

[3] The Court responds to this textual difference by asserting that "the word 'another' serves simply to rule out the countries already tried at the third step . . . ." *Ante*, at 343, n. 3. But the word "another" is not needed to rule out other countries; they are already ruled out by the phrase in clause (vii), "[i]f impracticable, inadvisable, or impossible to remove the

Our long-held view that distinct words have distinct meanings is, if anything, all the stronger here because the choice to use "another" was unmistakably deliberate. The prior statute governing deportable aliens like Jama described the country of last resort with a neutral modifier, providing that if no other suitable destination could be found then deportation had to be "to any country which is willing to accept such alien into its territory." Immigration and Nationality Act of 1952, § 243(a)(7), 66 Stat. 213 (codified from 1952 to 1996 at 8 U. S. C. § 1253(a)); see also Internal Security Act of 1950, § 23, 64 Stat. 1010 (nearly identical text). But in 1996 Congress went to the trouble of changing "any" to "another," legislative action that can neither be dismissed as inadvertent nor discounted as a waste of time and effort in merely exchanging two interchangeable modifiers.

The Court cannot be right in reducing the 1996 amendment to this level of whimsy. And if there were any doubt about what Congress was getting at when it changed "any country" to "another country," legislative history and prior case law combine to show what Congress had in mind. At least one House of Congress intended various 1996 amendments (including "any country" to "another country") to make no substantive change in the law. H. R. Conf. Rep. No. 104–828, p. 216 (1996); H. R. Rep. No. 104–469, pt. 1, p. 234 (1995) (Judiciary Committee Report) (both describing the relevant section as merely "restat[ing]" the earlier provision). Accordingly, the change from "any" to "another" makes most sense as a way to bring the text more obviously into line with an understanding on the part of Congress that

alien to each country described in a previous clause of this subparagraph." § 1231(b)(2)(E)(vii). Even had Congress used "a country" or "any country" instead of "another country," that is, the "countries already tried at the third step," *ante*, at 343, n. 3, would still be "rule[d] out," *ibid.*, by the "impracticable, inadvisable, or impossible" language.

an acceptance requirement applied to all options for deporting all aliens at step three.[4]

This is also the understanding that fits with what we know about the view of the law outside of Congress. In an early decision by Judge Learned Hand, the Second Circuit squarely held that the pre-1996 designations of receiving countries were all subject to the country's acceptance. *United States ex rel. Tom Man* v. *Murff*, 264 F. 2d 926 (CA2 1959). Other Circuit opinions took the same position in dicta. *E. g., Amanullah* v. *Cobb*, 862 F. 2d 362, 365–366 (CA1 1988) (opinion of Pettine, J.); *id.*, at 369 (Aldrich, J., concurring) (both citing *Tom Man, supra*); *Chi Sheng Liu* v. *Holton*, 297 F. 2d 740, 743 (CA9 1961) (citing *Tom Man* and describing the predecessor to §1231(b)(2) as "provid[ing] that an alien cannot be deported to any country unless its government is willing to accept him into its territory" (internal quotation marks omitted)). Nor was the consensus confined to the courts, for the Board of Immigration Appeals read the predecessor to subparagraphs (E)(i)–(vi) as having an acceptance requirement. *Matter of Linnas*, 19 I. & N. Dec. 302, 307 (1985) ("[T]he language of that section expressly requires, or has been construed to require, that the 'government' of a country selected under any of the three steps must indicate it is willing to accept a deported alien into its 'territory'"); but cf. *Matter of Niesel*, 10 I. & N. Dec. 57, 59 (BIA 1962).[5] And even within the Government, this

---

[4] The point is simply that Congress changed the text to make it reflect more clearly what Congress understood the law to be already, an understanding I explain in the text following this note. There is no suggestion that the change created "a momentous limitation upon executive authority," *ante*, at 344, n. 3; quite the contrary.

[5] The Court contends that in *Linnas* the Board of Immigration Appeals was simply "adher[ing]" to the relevant circuit precedent. *Ante*, at 350, n. 10. But the Board never stated that it was merely following circuit precedent, a notable omission when contrasted with the BIA decisions the Court cites, in which discussion of the Board's policy of honoring circuit

understanding seems to have survived right up to the time this case began to draw attention, for just last year the Justice Department's Office of Legal Counsel rendered an opinion (albeit one not directly addressing § 1231(b)(2)) stating that an acceptance requirement attaches to clauses (i) through (vi). Memorandum Opinion for the Deputy Attorney General: Limitations on the Detention Authority of the Immigration and Naturalization Service 27, n. 11 (Feb. 20, 2003), available at http://www.usdoj.gov/olc/INSDetention. htm (as visited Dec. 7, 2004, and available in Clerk of Court's case file).

The Government, like today's Court, is fighting uphill when it tries to show that these authorities failed to express the consensus view of the law at the time Congress rearranged the statutes, and neither Government nor Court cites a single judicial ruling, prior to the Eighth Circuit's decision here, that held or stated in dicta or even implied that the acceptance requirement did not apply throughout the third step. The District Court in this case, echoing the Magistrate Judge, stressed this very point, saying that "in fifty pages of briefing, the government has not cited a single case in which a federal court has sanctioned the removal of a legally admitted alien to a country that has not agreed to accept him." App. to Pet. for Cert. 52a (emphasis and internal quotation marks omitted).[6] The Court similarly cites "not . . . a single case." The fair conclusion is that when

---

precedent was explicit. *Matter of K— S—*, 20 I. & N. Dec. 715, 718–720 (1993); *Matter of Anselmo*, 20 I. & N. Dec. 25, 31 (1989).

[6] The absence of contrary case law also knocks out the sole authority the Court relies on to reject Jama's argument that the prior law enjoyed a settled construction requiring consent. *Ante*, at 351. The Court cites *United States* v. *Powell*, 379 U. S. 48 (1964), which denied that there was any settled construction precisely because there was a case taking a contrary viewpoint, *id.*, at 55, n. 13 (citing *In re Keegan*, 18 F. Supp. 746 (SDNY 1937)). *Powell* is thus beside the point here given the unanimity of the courts that construed the former deportation provision to require acceptance.

Congress amended the statute, it understood the law to require a country's consent and chose language suited to that understanding.

The Court's attempt to undercut this evidence founders on a mistake of fact. The Court describes the 1996 amendment as creating the current removal scheme "through the fusion of two previously distinct expulsion proceedings, 'deportation' and 'exclusion.'" *Ante*, at 349. According to the Court, this fusion neutralizes Jama's contention that the settled understanding of the prior law, expressed in consistent judicial treatment, was meant to be carried forward into subparagraphs (E)(i)–(vi). Because the current statute was "forged . . . out of two provisions [one on exclusion and one on deportation], only one of which [on deportation] had been construed as petitioner wishes," *ante*, at 351, the Court says it is unsound to argue that Congress meant to preserve an acceptance requirement when the statute merged the old exclusion and deportation laws.

The Court goes wrong here, and we have already seen how. It is true that the 1996 law uses the word "removal" to cover both exclusion and deportation, *e. g.*, *Calcano-Martinez v. INS*, 533 U. S. 348, 350, n. 1 (2001), and places the former exclusion and deportation provisions in a single section (indeed, a single subsection) of the U. S. Code. The statutory provision now before us, however, in no way resulted from a textual merger of two former provisions. As noted, the language of the prior exclusion provision appears (with very few changes from its predecessor) in one paragraph, compare § 1231(b)(1)[7] with 8 U. S. C. § 1227(a) (1994 ed.), while the language on deportation appears in a separate paragraph, § 1231(b)(2), which tracks almost exactly the text of the former deportation provision, compare § 1231(b)(2) with 8 U. S. C. § 1253(a) (1994 ed.). The provision to be construed, then, is not a "fusion" of old fragments on different

---

[7] This is the paragraph that contains a last-resort provision using "[a] country" instead of "another country."

subjects, but language unchanged in any way helpful to the Government from the text of the prior law, with its settled judicial and administrative construction.

The Court responds that § 1231(b)(2) must descend from the prior exclusion provision because the old exclusion provision would have been used to send an alien in Jama's situation out of the country, whereas now § 1231(b)(2) is used. *Ante*, at 351, n. 11. But this is beside the point. The issue before us concerns the process (laid out in § 1231(b)(2)) by which certain aliens are sent out of the country. We are considering what that process requires. The Court's observation, by contrast, involves the separate issue of who is covered by that process. Put simply, whether or not changes to other sections of the Act or to the implementing regulations enlarged the class of aliens subject to the process is irrelevant to the question of what the process is, that is, the question of what § 1231(b)(2) provides.

In sum, we are considering text derived from earlier law understood to require a receiving country's acceptance of any alien deported to it at step three. The only significant textual change helps to express that understanding of the law's requirements, and two House Reports stated that the amending legislation was not meant to change substantive law. Text, statutory history, and legislative history support reading the clause (vii) language, "another country whose government will accept the alien," as providing that any "country" mentioned in the six preceding clauses, (i) through (vi), must also be willing to accept the alien before deportation thence may be ordered.

## II

I mentioned how reference to § 1231(b)(1), governing exclusion, illuminates the choice to speak of "another country" in § 1231(b)(2). A different cross-reference within the statute confirms the reading that all step-three choices are subject to an acceptance requirement. Jama argues that subparagraph (D), laying out step two, contains an acceptance

requirement that in most cases the Government will be able to circumvent under the Court's interpretation of subparagraphs (E)(i)–(vi) as lacking any such requirement.[8] The point is well taken.

Subparagraph (D) provides that if an alien is not removed to the country designated at step one, the Secretary "shall [at step two] remove the alien to a country of which the alien is a subject, national, or citizen unless the government of the country" is unwilling to accept the alien or fails to inform the Secretary within a certain time that it is willing. § 1231(b)(2)(D). On the Court's reading of subparagraph (E), however, anytime an alien's country of citizenship (the designee at step two) is the same as his country of birth (a possible designee at step three, under subparagraph (E)(iv)), the country's refusal to accept the alien, precluding removal at step two, will be made irrelevant as the Government goes to step three and removes to that country under subparagraph (E)(iv). This route to circumvention will likewise be open to the Government whenever, as will almost always be the case, an alien's country of citizenship is also described in one of the other clauses of subparagraph (E). If an alien, for example, resided in his country of citizenship at any time prior to his arrival in the United States (as is undoubtedly true in virtually every case), the Government could get around the acceptance requirement of subparagraph (D) by removing him at step three: under clause (i) if he came directly from his country of citizenship or clause (iii) if he came by way of another country or countries.[9]

---

[8] The Government contends that subparagraph (D) actually contains no acceptance requirement, but as discussed below this argument is untenable.

[9] The Court misses the point in saying that "it will not always be true" that "the country the [Secretary] selects at step three . . . also [is] the country of citizenship . . . ." *Ante*, at 346 (emphasis deleted). The point is not that under the Court's reading the Government will necessarily select a country at step three that allows it to circumvent the step-two

The Court's attempt to deflect this objection, like its attempt to deflect the pre-1996 consensus, runs into a mistake. As the Court inaccurately characterizes Jama's argument, he contends that reading a general acceptance requirement out of subparagraph (E) would permit circumvention of the acceptance requirement in "subparagraph (A) or (D)." *Ante,* at 346. The Court then goes on to answer the argument as thus restated by (correctly) pointing out that there is no unconditional acceptance requirement at every stage before step three; this is so because subparagraph (A) imposes no absolute acceptance requirement at step one. Instead, subparagraph (C) provides that the Government "may," but need not, refrain from deporting an alien to his country designated at step one if that country is unwilling to accept him. *Ante,* at 346–347.

But the acceptance provision governing subparagraph (A) (step one) is beside the point. Jama's argument rests not on some common feature of "subparagraph[s] (A) [and] (D)," *ante,* at 346, but on the text of subparagraph (D), that is, on step two alone. He argues that the Government's power under that step is subject to an acceptance requirement, which the Government's reading would allow it to skirt.[10]

---

acceptance requirement, but rather that it will always, or almost always, have the option to do so.

Here again, as with the Court's four-step interpretation of the statute, see *supra,* at 353, n. 2, not even the Government can subscribe to the Court's view, instead acknowledging forthrightly that in all or almost all cases, the alien's country of nationality will also be described in one of the clauses of subparagraph (E). Tr. of Oral Arg. 47 ("[T]he state of nationality is . . . always or virtually always going to be covered [in subparagraph (E)] because [the clauses of that subparagraph] include country of birth, country from which the alien departed to enter the United States, country in which he previously resided, country . . . that exercises sovereignty over the country in which he was born").

[10] This is the argument in Jama's brief: "This proposed interpretation of the removal statute, by which the [Government] can avoid the explicit acceptance requirement of step two by removing the alien to the same

As for the argument that Jama actually makes about the step-two acceptance requirement, the Court says only that it "need not resolve whether subparagraph (D)" contains such a requirement. *Ante*, at 347, n. 7. But that is precisely what we do need to resolve, for if step two does contain an acceptance requirement, then the Court's interpretation allows the Government to evade it in nearly if not actually all cases, simply by proceeding to step three. All the Court can muster in response to Jama's actual argument (an argument it ascribes to me) is the statement that "other [unnamed] factors suffice to refute the dissent's more limited contention." *Ibid.*

The Government at least joins issue with Jama, when it claims step two has no acceptance requirement to evade.

---

country without acceptance in step three, . . . would make the second step of the statute, which requires acceptance by the government of which the alien is a subject, national, or citizen, superfluous and thus would violate a basic principle of statutory construction. As the district court observed, 'a removable alien will almost invariably be a "subject, national, or citizen" of the country in which he was born. As a result, the acceptance requirement of § 1231(b)(2)(D) is easily circumvented by § 1231(b)(2)(E)(iv) if the latter clause is read not to require acceptance.'" Brief for Petitioner 27 (citation omitted); see also *id.*, at 28 ("The Ninth Circuit relied in part on this [circumvention] argument in ruling that the acceptance requirement also applies in step three. It noted that if respondent's interpretation were upheld, then even though a government has actually refused acceptance of a removable person in step two, the person could be airdropped surreptitiously into that same country if it met the requirements of one of the subparts [of step three]" (second alteration in original; internal quotation marks omitted)).

The Court responds by pointing to the heading for a different section of Jama's brief and to isolated statements that appear in still other sections. *Ante*, at 345, n. 6. But the most the Court could say based on these references is that Jama advances alternative challenges: first that acceptance is required at every step (in which case it should be required in subparagraphs (E)(i)–(vi)) and second that acceptance is at least required at step two, in which case the Government's interpretation allows the step-two acceptance requirement to be circumvented. Parties making alternative arguments do not forfeit either one, yet the Court ignores Jama's second argument.

The Government says that subparagraph (D) imposes the acceptance condition only on the Secretary's mandate to remove to the country of citizenship; it does not so condition the Secretary's discretionary authority. When acceptance is not forthcoming, the Government insists, the Secretary still has discretion to do what is merely no longer obligatory. But for at least two reasons, this reading is unsound.

The first is the textual contrast between steps one and two. As noted, subparagraph (C) can be read to give the Government express permission to ignore at step one a country's refusal to accept an alien: "The [Secretary] may disregard [an alien's] designation [of a country] if . . . the government of the country is not willing to accept the alien . . . ." § 1231(b)(2)(C). No such express grant of discretion appears in subparagraph (D), which provides that at step two, "the [Secretary] shall remove the alien to a country of [citizenship] unless the government of the country . . . is not willing to accept the alien . . . ." § 1231(b)(2)(D). The first of these ostensibly gives authority supplemented with discretion in the event that the acceptance condition is not satisfied; the second gives authority only if the acceptance condition is satisfied. The discretionary sounding language governing step one tends to show that Congress knew how to preserve the discretion to act in disregard of a country's nonacceptance; since it omitted any such provision suggesting discretion just a few lines later in subparagraph (D), the better inference is that Congress had no intent to allow the Government to ignore at step two a failure to accept by an alien's country of citizenship.[11] Once again in this case, then, drafting differ-

---

[11] Both the Court and the Government rely on such reasoning in another context, contending that because other parts of § 1231(b)(2) contain express acceptance requirements, no such requirement should be deemed to attach to subparagraphs (E)(i)–(vi). *Ante*, at 341 ("[O]ur reluctance [to imply an acceptance requirement] is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest"); Brief for Respondent 13 ("[T]he express references to acceptance in other parts of Section 1231(b)(2) simply highlight the absence of any such reference in Section 1231(b)(2)(E)(i)–(vi)"). As I

ences between provisions that address a similar subject may fairly be read to express differences in congressional intent.

The second reason to reject the Government's position follows from the text of the predecessor statute, which clearly provided that when acceptance was not forthcoming at step two, the Government had to move on to step three. The relevant language of the prior version (a version that consisted of one paragraph instead of the current five subparagraphs) read:

> "If the government of [the] country [of citizenship] fails finally to advise the Attorney General or the alien within three months . . . whether that government will or will not accept such alien into its territory, then such deportation shall be directed by the Attorney General within his discretion and without necessarily giving any priority or preference because of their order as herein set forth [to one of the countries now listed in subparagraph (E)]." Immigration and Nationality Act of 1952, § 243(a), 66 Stat. 212.

Under this statute, the Government obviously lacked the discretion it now claims, of removing an alien at step two without the consent of the country of citizenship. This is significant for our purposes because, as already mentioned, two House Reports on the bill that transformed the old law into the new one indicate that no substantive changes were in-

---

have discussed, of course, the Court's and the Government's application of this reasoning is misguided because the phrasing of subparagraph (E)(vii) expressly (through its use of the word "another") attaches an acceptance requirement to clauses (i)–(vi).

Notably, the Court embraces precisely the opposite reasoning elsewhere in its opinion, stating that the discretion given to the Secretary in subparagraph (E)(vii) "accords with the similar flexibility to pass over inappropriate countries that the statute gives the [Secretary] at the other steps . . . ." *Ante*, at 344. Why the Court is willing to find an implied grant of flexibility in subparagraph (D) even though "Congress has shown elsewhere in the same statute that it knows how to make such a [grant] manifest," *ante*, at 341, is something of a mystery.

tended. See *supra*, at 358. Given this documented intent, together with the absence of any contrary indication in the text or legislative history, the current version should be read as its predecessor was. See *Koons Buick Pontiac GMC, Inc.* v. *Nigh, ante,* at 63 (rejecting an asserted substantive change because of "scant indication" that Congress intended it).

In sum, subparagraph (D) provides no authority to remove at step two without the consent of the country of citizenship. Jama is consequently correct that unless all of the options at step three are read as being subject to the same consent requirement, the requirement at step two will be nullified.

## III

At the last ditch, the Court asserts that Jama's position would "abridge th[e] exercise of executive judgment," *ante,* at 344, and "run counter to our customary policy of deference to the President in matters of foreign affairs," *ante,* at 348. The Government similarly contends (throughout its brief) that Jama's approach would improperly limit the discretion of the Executive Branch. *E. g.,* Brief for Respondent 13 ("[C]onstruing Section 1231(b)(2)(E)(i)–(vi) not to require acceptance preserves the traditional authority of the Executive Branch to make case-by-case judgments in matters involving foreign relations"). But here Congress itself has significantly limited executive discretion by establishing a detailed scheme that the Executive must follow in removing aliens. This of course is entirely appropriate, since it is to Congress that the Constitution gives authority over aliens. Art. I, §8, cl. 4; see also, *e. g., INS* v. *Chadha,* 462 U. S. 919, 940 (1983) ("The plenary authority of Congress over aliens under Art. I, §8, cl. 4, is not open to question"). Talk of judicial deference to the Executive in matters of foreign affairs, then, obscures the nature of our task here, which is to say not how much discretion we think the Executive ought to have, but how much discretion Congress has chosen to give it.

* * *

I would reverse the judgment of the Court of Appeals.

## APPENDIX TO OPINION OF SOUTER, J.

Paragraph (1) of 8 U. S. C. § 1231(b) reads as follows:

"(1) Aliens arriving at the United States.

"Subject to paragraph (3)—

"(A) In general

"Except as provided by subparagraphs (B) and (C), an alien who arrives at the United States and with respect to whom proceedings under section [240] were initiated at the time of such alien's arrival shall be removed to the country in which the alien boarded the vessel or aircraft on which the alien arrived in the United States.

"(B) Travel from contiguous territory

"If the alien boarded the vessel or aircraft on which the alien arrived in the United States in a foreign territory contiguous to the United States, an island adjacent to the United States, or an island adjacent to a foreign territory contiguous to the United States, and the alien is not a native, citizen, subject, or national of, or does not reside in, the territory or island, removal shall be to the country in which the alien boarded the vessel that transported the alien to the territory or island.

"(C) Alternative countries

"If the government of the country designated in subparagraph (A) or (B) is unwilling to accept the alien into that country's territory, removal shall be to any of the following countries, as directed by the Attorney General:

"(i) The country of which the alien is a citizen, subject, or national.

"(ii) The country in which the alien was born.

"(iii) The country in which the alien has a residence.

"(iv) A country with a government that will accept the alien into the country's territory if removal to each country described in a previous clause of this subparagraph is impracticable, inadvisable, or impossible."