A10A2097. REED v. THE STATE.
(709 SE2d 847)

BARNES, Presiding Judge.

A jury convicted Jerome Reed of two counts each of aggravated stalking and criminal trespass, and the trial court sentenced him to seven years, to serve two in confinement. He appeals, contending the

184

evidence was insufficient, the trial court erred in admitting similar transaction evidence, and his trial counsel was ineffective. For the reasons that follow, we affirm the convictions.

1. Reed contends the evidence presented at trial was insufficient to sustain his convictions. On appeal from a criminal conviction, we construe the evidence in the light most favorable to the verdict, and the defendant is no longer presumed innocent. *Crane v. State*, 297 Ga. App. 880, 880-881 (678 SE2d 542) (2009). When we evaluate whether the evidence was sufficient to support a conviction, we neither weigh it nor determine witness credibility, but only determine whether a rational trier of fact could have found the defendant guilty of the charged offenses beyond a reasonable doubt. Id.

Reed was charged with two counts of criminal trespass for intentionally damaging the victim's tires, and with two counts of aggravated stalking for violating a temporary protective order by contacting the victim at her house, without her consent, "for the purpose of harassing and intimidating" her. The crime of "stalking" is defined as following, watching, or contacting someone, without her consent, to harass and intimidate her. OCGA § 16-5-90 (a). That subsection further defines the phrase "harassing and intimidating" as

> a knowing and willful course of conduct directed at a specific person which causes emotional distress by placing [her] in reasonable fear for [her] safety or the safety of a member of . . . her immediate family, by establishing a pattern of harassing and intimidating behavior . . . which serves no legitimate purpose.

A person commits the offense of aggravated stalking when he, in violation of an order or bond condition "prohibiting the behavior described in this subsection, follows, places under surveillance, or contacts another person . . . without the consent of the other person for the purpose of harassing and intimidating the other person." OCGA § 16-5-91.

Viewed in the light most favorable to the convictions, the victim testified at trial that she had known Reed since 2001, and became engaged to him in December 2003, but ended their relationship the following year. She recounted several instances of violence and jealousy during her time with Reed. For example, the victim discovered that Reed had obtained a key to her residence and gone through all her belongings when she was out of town, disposing of photographs and hundreds of letters from an ex-boyfriend. He had also listened to her voice mail messages at work without her permission or knowledge. In July 2003, Reed became angry while the couple was

in Florida at a family gathering, and after they came home Reed left multiple successive messages on the victim's work voice mail, "fussing just really, really bad, . . . forget me, forget my family," which were played at trial.

In February 2004, Reed forced the victim into her house and ripped her engagement ring off her finger. The victim obtained a temporary protective order against Reed based on that event, but did not end the relationship and asked that the case be dismissed. One night in July 2004 the victim told Reed not to come over because she and her sister were cooking for a party, but he came anyway, banged on the door, and then lurked outside for hours when she would not let him in. She saw him sporadically after that, and for the last time in November 2004.

On January 17, 2005, the victim began driving her car home from a friend's house and discovered that she had no brakes. She was able to stop the car with her parking brake, and her friend, who was an automobile mechanic, testified that the brake line to one of her front wheels had been cleanly cut. She bought a replacement part and because the car could not be moved, the mechanic repaired it on the spot. After that, before driving the car the victim always checked her brakes, and her brake line was cut twice more, on January 31, 2005 and on February 6, 2005, while the car was parked at her residence. At some point during this time frame, all four of the victim's tires were slashed and had to be replaced. After the second brake line incident on January 31, 2005, the victim contacted a detective and obtained an ex parte temporary protective order against Reed, and the court set a hearing date of February 17, 2005.

After the hearing, the court issued a "Stalking Twelve Month Protective Order" valid through February 16, 2006, finding that Reed had knowingly and wilfully violated the stalking statute and had placed the victim in reasonable fear for her safety. Reed was enjoined and restrained from harassing, interfering with, intimidating, or stalking the victim, from approaching within 100 yards of the victim, her residence, or her workplace, and from having any type of contact with the victim, including but not limited to telephone, fax, e-mail, voice mail, or mail.

The victim, on February 6, 2005, also installed a time-lapse surveillance camera after her brake line was cut for the third time. The camera was positioned to record the victim's car and area around it, and she turned it on at night and off in the morning. Her tires went flat after she drove to work on February 25, 2005, and she discovered the sidewalls had been punctured. She reviewed her surveillance video from the night before with the detective she had contacted regarding her brake lines, and the detective described the video as showing a tall, slender man approach the victim's car at 5:30

a.m. that day and bend over each tire. The victim was certain the man in the video was Reed, and the detective "felt it was a dangerous situation." A magistrate thereafter issued an aggravated stalking arrest warrant against Reed. The State played the February 25, 2005 video at trial. As it played, the victim again identified the man bending over her tires as Reed, based on his build, the characteristic way he trotted from one place to another, and the way he held his left arm away from his body.

On March 2, 2005, the victim's second set of new tires went flat after she drove to work, and she discovered that the sidewalls had been punctured. The detective viewed a videotape of the incident, which showed a man walking around the victim's car at 2:18 a.m., leaning toward each tire and moving his hands from his body toward the car. As the jury watched the tape, the victim identified the man in the recording as Reed, based on his build and body movements, Reed was arrested for aggravated stalking, and on March 17, 2005, he was released on bond over the State's opposition. The court imposed the following special condition of bond: "Have no contact of any nature or type w[ith the victim]. Absolutely no contact!"

Reed was subsequently indicted on two counts of criminal trespass for damaging the victim's tires on February 25, 2005 and March 2, 2005, and for aggravated stalking based on his violation of the twelve-month stalking protective order prohibiting him from having contact with the victim. In July 2008, Reed notified the State of his intent to present alibi witnesses, and the victim remained in contact with the DeKalb County District Attorney's office.

When the prosecutor contacted the victim shortly before the trial, which began on April 28, 2009, she mentioned that Reed had approached her at Wal-Mart on March 8, 2009. The prosecutor obtained copies of store recordings that documented the encounter, and on March 26, 2009 the State moved to revoke Reed's bond. On April 1, 2009, the State filed a notice of its intent to present evidence about the Wal-Mart encounter as a similar transaction.

During the similar transaction hearing before trial, the State explained that it had filed the similar transaction notice "out of an abundance of caution," even though the incident involved the same victim. Reed objected, arguing that he had no notice about the similar transaction, that the victim initiated the chance encounter, that the incident was not sufficiently similar to establish a course of conduct or pattern of behavior, and that the State wanted to introduce it for the improper purpose of showing Reed had a propensity to commit the crime of aggravated stalking. The trial court reviewed recordings of the encounter, and held that evidence of the incident was admissible.

After the trial court gave the jury a limiting instruction, the

victim testified that she had been shopping with her grandson on March 8, 2009 when she heard her name called three times. While a recording played, the victim testified that it showed Reed pause at the aisle where she was shopping, then unbeknown to her, he walked up and down aisles close to her for 14 minutes before he approached her and said, "I just wanted to make sure it was you." She replied that he knew what she looked like and walked away to finish her shopping. She found his unsolicited contact "a little" intimidating. When the victim went to pay for her items, she continued past a check-out line where Reed was standing. Reed approached her again and began asking questions about her family and her grandson, who turned and asked his grandmother, "Nana, have we met him before?" Reed replied to the grandson, "No, I'm just an admirer of your grandmother's," and left.

Reed testified, admitting he removed the victim's ring from her finger by force in February 2004, but denied that the angry, profanity-laced voice mail messages from July 2003 were from him. Reed also denied being the person in the victim's surveillance videos on February 25, 2005 and March 2, 2005, and denied cutting the victim's brake lines or ruining her tires. He testified that he had been traveling during that time period, although on cross-examination he changed his testimony about his travel dates and itinerary.

We conclude that the evidence as outlined above was sufficient for a rational trier of fact to find Reed guilty beyond a reasonable doubt of two counts of aggravated stalking and of criminal trespass. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Reed contends the trial court erred in allowing the State to introduce as a similar transaction evidence of his March 2009 encounter with the victim in Wal-Mart. He argues that the State "procedurally" failed to give him proper notice of its intent to introduce the evidence, and that evidence of this encounter was not substantively admissible because the protective order had expired and because it was not similar to the crimes for which he was on trial.

Reed is correct that the Wal-Mart encounter was not a similar transaction, because it involved the same victim. "Similar transactions are independent crimes or occurrences that are unrelated or not connected to the crime with which the defendant is charged." *Freeman v. State*, 269 Ga. App. 435, 436 (1) (604 SE2d 280) (2004).

> Unlike similar transactions, prior [and subsequent] difficulties between the parties are not independent acts or occurrences, but are connected acts or occurrences arising from the relationship between the same people involved in the

> prosecution and are related and connected by such nexus. Evidence of a defendant's prior [and subsequent] act[s] toward the same victim, whether an assault, a quarrel, or a threat, is admissible as evidence of the relationship between the victim and the defendant and may show the defendant's motive, intent, and bent of mind in committing the act against the victim which results in the charges for which the defendant is being prosecuted.

Id. at 436-437 (1). The issue in *Freeman* was whether evidence of subsequent difficulties between the defendant and victim was subject to the similar transaction evidence requirements of USCR 31.3, involving notice and a hearing. We found "no material difference between . . . prior and subsequent difficulties evidence," and held that the trial court therefore need not conduct a hearing before the State introduces subsequent difficulties evidence. Id. at 438 (1).

A subsequent difficulty between a defendant and the victim is admissible as evidence of the relationship between the two, and may show the defendant's motive, intent, and bent of mind in committing the alleged crime against the victim. *Bond v. State*, 283 Ga. App. 620, 622 (2) (642 SE2d 223) (2007). The State charged Reed with aggravated stalking for violating a protective order, and introduced the Wal-Mart evidence to show that Reed also violated a condition of his bond by accosting the victim. The order granting Reed bond on the condition he have no contact with the victim had not expired, and although Reed argues that the Wal-Mart evidence portrays only a "non-criminal, coincidental, consensual and friendly encounter" between himself and the victim "in a very public place," that is only his characterization of the incident. The victim testified she was "a little" intimidated by the encounter, and the jury could assess the credibility of Reed and the victim for themselves. The jury saw a recording of both the encounter between Reed and the victim and Reed's actions beforehand, which allowed them to judge the nature of the incident for themselves and determine whether it showed Reed's motive, intent, or bent of mind in committing the conduct charged against him.

While Reed argues the incident was presented to the jury as a similar crime, the trial court's cautionary warning during testimony simply described the encounter as a "similar transaction," which the jury could consider "for the limited purpose of showing, if it does, the state of mind and intent of defendant in the crime charged in the case now on trial. Such evidence, if any, may not be considered by you for any other purpose." The court further instructed the jury that "the defendant is on trial for the particular offense charged in this bill of indictment only, and he is not on trial for the other offense or

transaction. The Court does not express an opinion as to whether the defendant has committed any offense. This is solely a matter for your determination." Finally, the trial court instructed the jury that before considering the transaction even for that limited purpose, it had to decide if Reed committed the other transaction and whether it was similar enough that proof he did it tended to prove he did the charged crime. The court gave the same limiting instruction in its charge to the jury.

Reed argues that the "entire complexion" of the case would have been different if the encounter had been introduced and argued as a subsequent difficulty instead of a similar transaction, because the parties' opening statements and closing arguments would have been different. But the jury still would have seen the recording of the encounter and judged for itself its relevance to the charged crimes. The trial court still would have charged the jury that evidence of subsequent difficulties between Reed and the victim were admitted for the sole purpose of illustrating, if it did illustrate, "the state of feeling" between them and Reed's "bent of mind and course of conduct."

The trial court held a pre-trial hearing, found as fact that the State gave Reed notice of its intent to submit the Wal-Mart evidence, and gave a limiting instruction before the evidence was introduced, none of which is required for subsequent difficulty evidence. See *Hill v. State*, 243 Ga. App. 124, 125-126 (2), n. 2 (532 SE2d 491) (2000) ("While prior difficulties are admissible to show that past actions may be indicative of the defendant's actions at the time of the offense charged, similar transaction evidence is inadmissible for such a broad purpose."). The presence of these additional safeguards and limitations does not make the otherwise admissible evidence inadmissible.

3. Reed contends his trial counsel was ineffective for failing to present sufficient foundation evidence to introduce into evidence a hotel receipt; for failing to object to an improper question impeaching a defense witness; and for failing to request charges on identification.

> [T]o prevail on a claim of ineffective assistance of counsel, a criminal defendant must show that his attorney's performance was deficient and that the deficiency so prejudiced him that there is a reasonable likelihood that, but for counsel's errors, the outcome of his trial would have been different. The defendant must overcome the strong presumption that counsel's conduct was within the broad range of reasonable professional conduct.

(Citations omitted.) *Lloyd v. State*, 280 Ga. 187, 190 (2) (625 SE2d

771) (2006).

(a) Trial counsel testified that he decided not to introduce into evidence Reed's hotel receipt for the night of March 1, 2005 to March 2, 2005, but to use it only to refresh Reed's recollection of his whereabouts that day, because counsel thought Reed's alibi witnesses would be better evidence. The receipt had no time stamp on it, was not signed by Reed, was for cash, and a copy was not requested until September 2006. Matters of reasonable trial tactics do not amount to ineffective assistance of counsel; here, the record reflects that trial counsel's decision to focus on Reed's alibi witness was clearly a matter of strategy, which we cannot say was patently unreasonable. *Williams v. State*, 293 Ga. App. 193, 198 (3) (a) (666 SE2d 703) (2008). Thus, we affirm the trial court's finding that no deficiency was shown in this regard.

(b) Reed claims his trial counsel was ineffective for failing to object when the State asked his defense witness about a 2006 conviction for car theft. At the new trial hearing, counsel did not recall why he did not object. Regardless of whether trial counsel's performance in this regard was deficient, however, Reed cannot show that any deficiency prejudiced him, because he cannot show a likelihood that his trial would have ended differently if counsel had objected.

The witness testified that he had lunch with Reed in Augusta on March 1, 2005, and that when Reed left at 12:30 p.m. he said he was traveling to North Carolina. Reed called him later that evening to say he was in North Carolina, and on cross-examination, the witness admitted he did not know for sure where Reed was then and said he had come to trial to testify about Reed's good character. Reed testified that he traveled from North Carolina to Augusta on February 26, 2005, and left Augusta on March 3, 2005, to return home to Atlanta. He also said that he ate lunch with his witness on March 1, 2005, but when reminded that the witness testified that Reed left Augusta on March 1 to go to North Carolina, Reed responded: "See, James, me and James talk. He doesn't know exactly what I do. I don't tell him about my business. And one thing, we are friends for a good while, but we talk about business and we talk about personal; but like I said, what I do, I do my thing." Then Reed said he arrived in Augusta on March 1, 2005. As the State said, Reed thus "torpedoed the testimony of his own alibi witness; under these circumstances, [trial counsel] not objecting to the State's failure to tender a certified copy of conviction to impeach [the witness] could not have reasonably resulted in a different verdict at trial." See *Walker v. State*, 268 Ga. App. 669, 673-674 (4) (a) (602 SE2d 351) (2004).

(c) Finally, Reed claims his trial counsel was ineffective for

failing to request pattern jury charges on "Identification; Reliability" and "Identification; Burden of Proof." Reed makes no further argument and cites no authorities to support this claim, other than the bare statement that failure to request the charges amounted to ineffective assistance and made it reasonably likely that the result of the trial would have changed. "When the asserted error of failure to charge is reached indirectly through a claim of ineffective assistance of counsel the test is whether, had the charge been requested, authorized, and given, there is a reasonable probability it would have changed the outcome of the trial." (Emphasis omitted.) *Springs v. Seese*, 274 Ga. 659, 661 (3) (558 SE2d 710) (2002). As Reed's trial counsel testified, this was not a typical identity case, in which the victim saw the defendant-stranger only for a short time while the crime was committed. The victim based her identification of Reed as the man puncturing her tires on the videotapes based on her knowledge of his build and mannerisms acquired during her lengthy relationship with him. The jurors saw the videos for themselves, and were able independently to judge the validity of the victim's identification. Additionally, the trial court "then thoroughly and correctly charged the jury on the presumption of innocence, reasonable doubt, burden of proof, credibility of witnesses, and impeachment of witnesses." Id. Given the circumstances, the trial court did not err in finding no reasonable probability that if separate charges on identity had been given, the outcome of the trial would have been different.

*Judgment affirmed. Blackwell and Dillard, JJ., concur.*

DECIDED MARCH 23, 2011 —
RECONSIDERATION DENIED APRIL 11, 2011 — ■

*Kenneth W. Sheppard*, for appellant.
*Gwendolyn Keyes Fleming, District Attorney, Akintunde A. Akinyele, Daniel J. Quinn, Assistant District Attorneys*, for appellee.