## A11A0566. KEATON v. THE STATE.

(714 SE2d 693)

ADAMS, Judge.

Corey Keaton appeals the trial court's denial of his motion for new trial following his conviction on charges of rape, aggravated assault, burglary, aggravated stalking and kidnapping in connection with an incident involving his estranged wife.[1] For the reasons set forth below, we reverse Keaton's aggravated stalking conviction, but otherwise affirm.

Viewed in the light most favorable to the verdict, the evidence showed that Keaton was employed as a police officer with the Waycross Police Department. The victim filed for divorce from Keaton in April 1998, and a rule nisi issued at that time forbidding Keaton from having any contact with her "[p]ending the interlocutory hearing." The subsequent interlocutory order did not enjoin Keaton from having contact with the victim, but enjoined him from going to the marital residence except to retrieve or return the children for visitation. The record supports a finding that Keaton violated this order on a number of occasions, including one occasion when he entered the victim's house without her permission and demanded sex. After the victim reported this and other violations to police, Keaton's supervisor at the Waycross Police Department issued a written order on May 29, 1998, directing him to obey the trial court's April 1998 order or risk a charge of insubordination under department regulations.

On September 12, 1998, the victim was home alone, when Keaton knocked on her door and asked to come inside. The victim refused. She said that Keaton then disabled the phone and entered the house through a back window. The victim said that when she tried to run away, Keaton attacked her and a protracted struggle ensued during which he raped her. After Keaton left, the victim reported the attack to the Ware County Sheriff's office.

Several witnesses testified in Keaton's defense that the victim and he were attempting to reconcile prior to the incident. And Keaton testified that the victim and he had sex on various occasions after they separated and that he previously had spent the night at her house. He said that on the day at issue, the victim and he had consensual sex, but later began to quarrel, and the struggle ensued

---

[1] This is the second appearance of this case before this Court. After Keaton filed an earlier appeal from the denial of his original motion for new trial, he raised allegations that his trial attorneys rendered ineffective assistance of counsel. This Court subsequently remanded the case for hearing on these allegations before addressing the merits of his appeal. The trial court appointed new counsel and, after a full hearing, denied the amended motion for new trial. This appeal followed.

after the victim hit him with her shoe.

1. Keaton first asserts that the evidence was insufficient to support his conviction for aggravated stalking[2] because the State failed to prove that his actions were in violation of an order contemplated by the aggravated stalking statute, OCGA § 16-5-91. He asserts the interim order relied upon by the prosecution was directed toward preserving the victim's right to occupy the marital residence and preventing his interference with that right, but it was not a personal protective order or an order otherwise preventing stalking behavior as required under the statute. We agree.

(a) A person commits the offense of aggravated stalking when he or she, in violation of an order, a peace bond, an injunction or a probation, parole or bond condition *"in effect prohibiting the behavior described in this subsection,* follows, places under surveillance, or contacts another person at or about a place or places without the consent of the other person for the purpose of harassing and intimidating the other person." (Emphasis supplied.) OCGA § 16-5-91 (a). From the time of its enactment, this statute has consistently been interpreted as requiring that the underlying bond, order, injunction or probation, parole or bond condition prohibits stalking behavior.[3] See, e.g., Ochandarena, "Crimes Against the Person: Prohibit Stalking of an Intended Victim," 10 Ga. St. U. L. Rev. 95 (1993) ("Aggravated stalking occurs when the [stalking conduct] occurs subsequent to a judicial order issued to prohibit stalking, such as a temporary restraining order or a condition of parole or probation.") (footnote omitted). The dissent's analysis places undue emphasis upon the grammatical structure of the statute, while ignoring the legislative purpose behind it, to conclude otherwise.[4] Moreover, the dissent's analysis has abso-

---

[2] Keaton does not contest the sufficiency of the evidence supporting the jury's verdict on the remaining charges.

[3] Peace bonds and temporary protective orders were not added to the list until an amendment in 1995. Ga. L. 1995, p. 911, § 1.

[4] The first version of the aggravated stalking bill, S. B. 13, sponsored by Senator Mary Margaret Oliver, was completely different from the bill eventually enacted. Oliver's initial bill made no mention of orders, injunctions, bond conditions or the like. Rather it based the offense of aggravated stalking on certain actions or the existence of the pending complaint. 1993 Ga. Sen. J., v. 1, p. 141. Four other bills were pending in the house at the same time. 1993 Ga. House J., v. 1, pp. 68, 125, 299, 951. In a substitute version of S. B. 13, the House Judiciary Committee changed the definition of aggravated stalking to focus upon the violation of a court action after considering the various house proposals, including one sponsored by Rep. Cathy Cox. 1993 Ga. House J., v. 2, pp. 2004-2005; Ochandarena, at 97, n. 29. One commentator conducted an April 12, 1993 interview with Cox, who explained the change by noting that "[o]ffenders who disregard a judicial order prohibiting stalking were viewed as in need of more severe sanctions." Ochandarena, at 98, n. 33. Because Georgia has no formal legislative history, this interview may offer the best contemporaneous view of the legislature's intent. It appears likely that the legislators were more focused upon providing enhanced punishment for those who violate existing stalking orders, conditions, or injunctions than they were upon

lutely no support in the case law or commentary; no cases have drawn any distinction in how the orders in the list are considered under the aggravated stalking statute based upon grammatical placement or otherwise.[5]

Putting aside the orders clearly intended for personal protection, the dissent's analysis would define the crime of aggravated stalking to include the violation of any temporary restraining order, preliminary injunction, or permanent injunction, whatever the subject matter and regardless of any connection to the victim, if the other statutory elements are met; but conditions of pretrial release, probation or parole must prohibit stalking behavior in order to serve as the basis for an aggravated stalking conviction. Thus, if a defendant were enjoined from entering a property due to a labor dispute, for example, and crossed the subject property while engaged in stalking behavior, the dissent would find him guilty of aggravated stalking. But if he committed the same actions in violation of a probation condition unrelated to stalking behavior, he would not have committed aggravated stalking. We do not believe that the General Assembly intended such a result in enacting the crime of "aggravated stalking." Rather, the statute more logically should be read as requiring a prohibition against stalking behavior in any of the underlying orders, injunctions, bonds or conditions listed in the statute.

(b) The interim order relied upon by the State in this case provides, in pertinent part, that "the [victim] is awarded the exclusive use and possession of the marital home of the parties and [Keaton] is enjoined from going to the home except to exercise his visitation rights with the children of the parties." This order keeps Keaton away from a place, not a person, but Georgia's stalking laws

---

precisely placing these items among the disjunctives in the statute. Nothing in the progress of the bill through the legislature suggests otherwise.

[5] Although no cases have addressed the present issue directly, the cases appear to apply the modifying language "in effect prohibiting the behavior described in this subsection" to orders, bonds, injunctions or conditions without regard for where they appear in the statutory list. See, e.g., *State v. Carlisle*, 280 Ga. 770, 771 (1) (631 SE2d 347) (2006) ("Under OCGA § 16-5-91 (a), a person commits the offense of aggravated stalking when, in violation of certain types of court orders that 'in effect prohibit( ) the behavior described in this subsection' . . .") (condition of pretrial release); *Reed v. State*, 309 Ga. App. 183, 184 (1) (709 SE2d 847) (2011) ("A person commits the offense of aggravated stalking when he, in violation of an order or bond condition 'prohibiting the behavior described in this subsection' . . .") (12-month temporary protective order); *Ford v. State*, 283 Ga. App. 460, 460 (1) (641 SE2d 671) (2007) (applying modifying language "in effect prohibiting the behavior described in this subsection" to temporary and permanent restraining orders and temporary and permanent protective orders) (temporary protective order); *Stevens v. State*, 261 Ga. App. 73 (581 SE2d 685) (2003) ("A person commits aggravated stalking when he violates a judicial order, including a condition of pretrial release, 'prohibiting the behavior described in this subsection,' . . . [Cit.]") (bond condition).

were drafted to protect people not places. The trial court previously had issued an order that prohibited "contact" with the victim, and that order in effect prohibited the behavior proscribed under the stalking laws, but it had expired. Although the interim order may have incidentally kept Keaton from face-to-face contact with the victim while she was at home, except for periods connected to visitation, it imposed no further limitations on Keaton's contact with the victim. So long as he did not physically go to the marital home, Keaton could call the victim at any time, could be anywhere near or in sight of the marital home, or could use any other method to harass and intimidate the victim inside the home or outside the home without violating the order. And significantly, Keaton would violate the order even if he went to the home when his wife was not there. We cannot say that an order that limits Keaton's presence at the marital home, but otherwise allows unfettered contact with the victim, "in effect" prohibits him from engaging in the behavior prohibited by the statute.

The dissent, however, construes the phrase "in effect" to encompass the violation of any order that happens to provide some incidental protection to a stalking victim, no matter how fleeting. Criminal statutes, however, must be strictly construed. Even if the dissent's analysis proposed a valid alternate interpretation of the phrase "in effect," "[w]hen a criminal statute fairly and reasonably is subject to two constructions, one which would render an act criminal, the other which would not, the statute *must* be construed strictly against the State and in favor of the accused." (Punctuation and footnotes omitted; emphasis in original.) *Jackson v. State*, 309 Ga. App. 24, 28-29 (1) (a) (709 SE2d 44) (2011). We apply a strict construction to hold that the order in this case, which merely prohibits the defendant's presence at a particular place, does not "in effect prohibit[ ] the behavior described in the subsection" as required by OCGA § 16-5-91 (a). Accordingly, we find that the State failed to establish an essential element of the crime of aggravated stalking: the existence of a prior order that in effect proscribed stalking behavior. Keaton's conviction on that count, therefore, necessarily must be reversed.[6] Compare *Bray v. State*, 294 Ga. App. 562, 562-563 (1) (669 SE2d 509) (2008) (upholding aggravated stalking conviction where special bond condition required defendant to " 'stay away, absolutely, directly or indirectly' " from ex-wife); *Ford v. State*, 283 Ga. App. 460, 461 (1) (641 SE2d 671) (2007) (same

---

[6] We note, however, that Keaton's behavior could have subjected him to prosecution for stalking under OCGA § 16-5-90 or criminal trespass. At the very least, he would have been subject to a finding of contempt for violating the order.

18

where temporary protective order " 'restrained and enjoined [defendant] from approaching within 100 yards of (his wife) . . . , except during exercise of visitation.' ").

2. Keaton next argues that the trial court erred in denying his motion for a mistrial after the State improperly placed his character into issue during its rebuttal examination of the victim about a conversation in which Keaton's mother asked her to drop the charges against Keaton.[7] The victim stated:

> She told me that [Keaton] had [seen] his father do her like that on several occasions and that she understood what I was going through and that she was sorry for it. She told me — she asked me if I could, if any chance at all possible for me to drop the charges because she couldn't have another son of hers going to jail.

At that point, Keaton's counsel moved for a mistrial on the ground that the prosecutor was trying to "impugn the integrity of the whole family"; the trial court denied the motion. Keaton argues on appeal that the trial court erroneously denied the mistrial because the State had introduced "improper evidence of the bad character of [his] father and brother."

Assuming, without deciding, that evidence of a relative's bad character somehow equates with evidence of a defendant's bad character, we find no error. Keaton's mother and other witnesses testified that the victim contacted Keaton at his mother's house and elsewhere after their separation.[8] The prosecutor stated that he was questioning the victim about her visits to Keaton's mother's house to "answer[ ]" that testimony, apparently by attempting to show other reasons for the visits. It was during this examination, in response to a question about whether Keaton's mother had ever talked about the case, that the victim gave the noted testimony. We cannot say under these circumstances that the trial court abused its discretion in denying the mistrial.[9]

> A witness may be impeached by disproving facts to which he has testified. Even evidence that would be inadmissible if

---

[7] In support of this argument, Keaton also cites earlier testimony from the victim describing a conversation with Keaton's aunt, in which the aunt states that her husband had stabbed her multiple times in the past and that Keaton was on suicide watch, but Keaton did not move for a mistrial or otherwise object to this testimony at trial.

[8] Additionally, Keaton called three separate witnesses to testify that he had a good reputation in the community.

[9] *Russell v. State*, 308 Ga. App. 328, 330 (707 SE2d 543) (2011) (trial court has considerable discretion in determining whether mistrial is necessary).

offered to impeach the defendant's character may be admissible to impeach the veracity of a witness. What is forbidden is the State's introduction *in the first instance* of evidence whose *sole probative value* is that it tends to show a defendant's bad character.

(Punctuation and footnotes omitted; emphasis in original.) *Arnold v. State*, 305 Ga. App. 45, 52 (4) (699 SE2d 77) (2010). In any event, the testimony with regard to Keaton's relatives was not directly responsive to the question, and "when a witness gives a non-responsive answer to a question impacting negatively on the defendant's character, this does not place the defendant's character in issue. . . ." (Punctuation and footnote omitted.) *Mathis v. State*, 299 Ga. App. 831, 835 (1) (c) (i) (684 SE2d 6) (2009) (apparently decided under the prior version of OCGA § 24-9-20 (b), which expressly excluded the admission of evidence of a defendant's bad character "unless and until the defendant shall have first put his character in issue"). See also *Walker v. State*, 282 Ga. 703, 705 (2) (653 SE2d 468) (2007).

3. Keaton next asserts that the trial court erred in allowing a prosecution police witness to read from a written report during his testimony. He asserts that the State was improperly attempting to bolster the victim's testimony regarding why she had not sought warrants against him for earlier violations.

The witness, Waycross Police Officer Robert Murray, testified that he had responded to two calls at the victim's house reporting that Keaton was there in violation of the Interlocutory Order. Murray testified as to both incidents and stated on direct that when he asked the victim after the second incident if she was going to prosecute, she replied that she was going to consult her attorney for advice. When the prosecution broached the subject again on re-direct and Murray repeated this answer, the prosecutor directed him to his written report of the second incident, which indicated that the victim said she did not want to swear out a warrant because she did not want Keaton to lose his job and thus his ability to provide financial support for his children. Keaton's trial counsel interposed an objection but was only able to state that "[the officer] was responding to the question, and . . ." before the trial judge ruled that he would allow Murray to read from his report.

Keaton's trial attorney did not further explain or otherwise perfect the record as to the ground for his objection. Certainly at no time did he raise the issue of improper bolstering. "In order to raise on appeal an impropriety regarding the admissibility of evidence, the specific ground of objection must be made at the time the evidence is offered, and the failure to do so amounts to a waiver of that specific ground." (Citations and punctuation omitted.) *Sanchez v. State*, 285

Ga. 749, 751 (3) (684 SE2d 251) (2009). See also *Powell v. State*, 308 Ga. App. 489, 490 (1) (707 SE2d 877) (2011).

4. Keaton argues that the trial court also erred in allowing, over his objection, a juror accused of misconduct to return to the jury room with other jurors while the Court considered his motion to excuse that juror. The record, however, contains no motion by Keaton to excuse the juror and no objection to her return to the jury room.

During the trial, a bailiff reported to the Court that he had heard a juror discussing evidence from the case with a couple at a restaurant the night before. The Court brought the matter to the attorneys' attention and asked whether they wished to pursue it. Keaton's counsel indicated that he did. The juror was brought in for questioning and denied discussing the case with anyone. Keaton's trial counsel did not object when the judge sent her back to the jury room after she was questioned. The bailiff was then questioned about what he overheard. After his questioning, Keaton's counsel stated, "I'd just ask the Court to make sure she's not back in the jury room right now telling them what's going on right now." At that point, the judge asked the jury to return and, following a bench conference, excused the juror in question.

We find no error. Keaton argues that the juror should not have been sent back with the other jurors, but his counsel did not object when the trial court directed her back to the jury room. Accordingly, Keaton waived this issue on appeal. "A party may not complain on appeal of a ruling that he contributed to or acquiesced in by his own action, trial strategy, or conduct." (Punctuation and footnote omitted.) *Lee v. State*, 284 Ga. App. 435, 439 (3) (644 SE2d 196) (2007). "Moreover, to the extent that [the] actions [of Keaton's counsel somehow could] be construed as an objection, he failed to elicit a ruling thereon and has therefore waived this claim." (Footnote omitted.) *Green v. State*, 298 Ga. App. 301, 303 (2) (680 SE2d 156) (2009).

Later when Keaton's counsel asked that the court make sure that the offending juror was not telling the other jurors what had occurred, the judge responded immediately by calling the jury back in and removing the offending juror from the panel. Although

> [t]here is a presumption of prejudice to the defendant when an irregularity in the conduct of a juror is shown and the burden is on the prosecution to prove beyond a reasonable doubt that no harm has occurred[,] we have also recognized that some irregularities are inconsequential. The decision whether to remove a juror from a panel lies within the

sound discretion of the trial court and will not be overturned absent an abuse of that discretion.

(Citation omitted.) *Tolbert v. State*, 300 Ga. App. 51, 53-54 (2) (684 SE2d 120) (2009). Here, there is no indication of any improper conduct by the offending juror in connection with the other jurors. Rather the only misconduct of record occurred between the juror and third parties. We cannot say under these circumstances that the misconduct "was so prejudicial that the verdict is inherently lacking in due process." (Punctuation and footnote omitted.) *Gresham v. State*, 303 Ga. App. 682, 684 (695 SE2d 73) (2010). And we find no abuse of discretion by the trial court in deciding to resolve the issue by removing the juror from the panel.

5. Keaton also contends that the trial court erred in allowing prior consistent statements to bolster the victim's testimony. In making this argument, Keaton does not point to any particular testimony or to any objection. Rather, he references a bench conference during which he told the judge that it was his understanding that the court would overrule "any of my objections to hearsay," specifically with regard to what the victim told others about her relationship with Keaton. The trial judge then replied that because Keaton's defense had questioned the victim's credibility and because the victim had testified and was available for cross-examination, any of her prior consistent statements would be admissible under *Gibbons v. State*, 248 Ga. 858 (286 SE2d 717) (1982).

Pretermitting whether the trial judge's statement was a proper application of the rule set out in *Gibbons*, Keaton fails to cite us to a single instance where he objected to the introduction of any prior consistent statements and where such objection was overruled. In fact, the trial court's discussion of *Gibbons* was not made in response to any specific objection or to a motion in limine but rather was a reply to counsel's assumption regarding the trial court's intent. See *Sanders v. State*, 179 Ga. App. 168, 169 (2) (345 SE2d 677) (1986) (appellate courts exist to review asserted error but where a defendant makes no objection and obtains no ruling, there is nothing for the Court to review). Even if we were to interpret the trial court's generalized statements as a ruling and even though Keaton contends that the statements effectively "hand cuffed" the defense and made objections "pointless," Keaton has failed to identify any prior consistent statements that he contends were admitted improperly. See Court of Appeals Rule 25 (c) (2) (i). ("Each enumerated error shall be supported in the brief by specific reference to the record or transcript. In the absence of such reference, the Court will not search for or consider such enumeration."). Accordingly, Keaton has given this Court nothing to review under this enumeration.

6. Keaton also contends that the trial court erred in denying his motion for new trial on the ground that he received ineffective assistance of counsel because his trial attorney failed: (a) to object to the prosecutor's taking the stand to provide rebuttal testimony; (b) to prepare for trial; and (c) to secure an unbiased jury.

In considering Keaton's claim of ineffective assistance of counsel, we apply the two-prong test set out in *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984). Keaton "must show that counsel's performance was deficient and that, but for that deficient performance, there is a reasonable probability that the outcome of his trial would have been different." (Footnote omitted.) *Jackson v. State*, 282 Ga. 494, 497 (2) (651 SE2d 702) (2007). In order to show that counsel's performance was deficient, "[t]he criminal defendant must overcome the strong presumption that trial counsel's conduct falls within the broad range of reasonable professional conduct." (Citation omitted.) *Robinson v. State*, 277 Ga. 75, 76 (586 SE2d 313) (2003). On appellate review, "[w]e accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts." Id.

(a) Keaton asserts that his trial attorneys were ineffective in failing to object to the prosecutor's taking the stand to counter the defense's cross-examination of the victim on rebuttal. The chief assistant district attorney ("Chief ADA") asked permission to testify in response to defense questioning that implied that the victim had been instructed to show more emotion when she took the stand in rebuttal and also that she had never cried when previously interviewed about the incident. Keaton's attorney stated that he did not "mind" if the Chief ADA took the stand. But Keaton's counsel objected during the subsequent examination when the Chief ADA was asked what the victim's demeanor had been during her pretrial interviews. He asserted that the question was more general than simply soliciting testimony that the victim had cried in earlier interviews and that when he agreed to the Chief ADA taking the stand, he had anticipated that the prosecutor would just state in his place that the victim had cried. The trial court allowed the testimony, and the Chief ADA stated that the victim had cried briefly when they interviewed her on two occasions. But when he began to describe her demeanor more generally, Keaton's attorney again objected, and the trial court sustained the objection.

Keaton's lead trial attorney testified at the hearing on his motion for new trial that he did not object to the Chief ADA's taking the stand to say the victim had previously cried because he "didn't think it was very effective on his part. I think it . . . made the State look[ ] pretty incompetent that the [Chief ADA was] the only one

that they could bring in to testify at the last minute . . ." as to the victim's emotional state after presenting numerous other witnesses. And the record demonstrates that the attorney successfully objected when the testimony went beyond the scope of his agreement on this point. Accordingly, Keaton's counsel's acquiescence in the prosecutor's limited testimony was a matter of trial strategy, and it is well settled that "matters of reasonable tactics and strategy, whether wise or unwise, do not amount to ineffective assistance of counsel." (Citations and punctuation omitted.) *Dyer v. State*, 295 Ga. App. 495, 498 (1) (672 SE2d 462) (2009).

(b) Keaton next asserts that his trial counsel failed to adequately prepare for trial. In support of this argument, he relies upon his brother Reginald Keaton's testimony at the motion hearing. Reginald testified that he met with Keaton's trial attorney about 8:00 or 9:00 the night before the trial. During that meeting, the attorney showed him a list of witnesses and asked what he knew about them. Reginald asked the attorney if he had interviewed the witnesses yet, and he said that the attorney replied that he had not because Corey Keaton had not paid all of the legal fees owed. Reginald also said that the attorney did not go over his testimony prior to trial and that if he had asked him earlier he could have given him information about contacts between the victim and Keaton that showed their intention to reconcile. Reginald acknowledged, however, that he did see the attorney talking to witnesses the morning before trial and Reginald further conceded that he testified about contacts between his brother and the victim at trial, but he said that he could have "delved deeper" with better preparation.

Keaton's lead trial attorney testified at the motion hearing, however, that he and his co-counsel interviewed "a lot of witnesses" and took affidavits from some of them. He also stated that they took testimony and information from witnesses during two earlier bond hearings. He said that his file contained memos of witness interviews and affidavits, along with addresses and telephone numbers, which demonstrate his trial preparation. Co-counsel also stated that he had interviewed a number of witnesses before trial and prepared affidavits from at least two of them for use in connection with a bond motion. Accordingly, the trial court would not have been clearly erroneous in concluding that Keaton failed to establish his attorneys' lack of preparation for trial. Moreover, Keaton utterly failed to demonstrate how any alleged lack of preparation created a reasonable probability that the outcome of his trial would have been different.

(c) Keaton also asserts that counsel were ineffective in failing to strike two jurors from the panel who each had interacted or had family members who had interacted with Keaton in his capacity as a

policeman. Keaton testified at the motion hearing that he had informed his attorneys that these two jurors might have problems with him. But Keaton's lead trial attorney testified that he did not recall the specific jurors, and he was sure that he discussed the jury panel with Keaton. He said he believed that if Keaton told him that he did not want someone on the jury, the only reasons they would have remained on the jury would have been that the defense was out of strikes or there were other prospective jurors they felt more strongly about striking from the panel. Co-counsel testified that his notes from the trial indicate that in their discussions with Keaton they had found the two jurors to be acceptable. Once again, we find no clear error in the trial court's conclusion that Keaton failed to establish ineffective assistance of counsel under the *Strickland* test on this ground.

*Judgment affirmed in part and reversed in part. Barnes, P. J., and Phipps, P. J., concur. Ellington, C. J., Miller, P. J., and Doyle, J., concur in Divisions 2, 3, 4, 5 and 6 and concur specially and in the judgment only as to Division 1. Blackwell, J., concurs in Divisions 2, 3, 4, 5 and 6 and dissents as to Division 1.*

DOYLE, Judge, concurring specially.

I fully concur with Divisions 2 through 6, but concur in the judgment only with regard to Division 1. The majority's and dissent's lengthy analyses of the grammatical structure of the aggravated stalking statute, OCGA § 16-5-91 (a), is unnecessary for a determination of this case.[10] Here, we do not have a violation of a "condition of pretrial release, condition of probation, or condition of parole in effect prohibiting the behavior described. . . ." Rather, Keaton is accused of violating an interlocutory (i.e., preliminary) injunction. OCGA § 16-5-91 (a) states:

> A person commits the offense of aggravated stalking *when such person, in violation of a . . . preliminary injunction, . . .* follows, places under surveillance, or contacts another person at or about a place or places without the

---

[10] I agree with the dissent that the phrase included in OCGA § 16-5-91 (a) that states that "in effect prohibiting the behavior" modifies only "condition of pretrial release, condition of probation, or condition of parole" and does not modify the initial list of orders and injunctions. In order for one of the orders or injunctions included in the initial list to be enforceable, it must identify the prohibited conduct with specificity. Thus, with a bond to keep the peace, a temporary restraining order, a permanent injunction, or one of the other orders in the initial list, it should be clear on the face of the order whether or not one is prohibited from engaging in conduct that if violated would fall within the aggravated stalking statute. On the other hand, conditions of pretrial release, probation, and parole are often listed on forms in general terms. Thus, the addition of the qualifying language — that the order must prohibit stalking in order to come within the ambit of the statute — is logical.

consent of the other person for the purpose of harassing and intimidating the other person.[11]

Stated another way, to be guilty of aggravated stalking, a defendant must engage in specific conduct that violates a preliminary injunction prohibiting certain stalking behavior.[12]

Here, the interlocutory order stated that "[Keaton] is enjoined from going to the home except to exercise his visitation rights with the children of the parties." Nowhere in the order did the court enjoin Keaton from following, placing under surveillance, or contacting his estranged wife. Thus, Keaton cannot be guilty of aggravated stalking, which requires the accused to have violated an order or injunction *prohibiting stalking*. Keaton did violate the court's order by going to the home for a reason not associated with visiting his children, but his actions do not constitute aggravated stalking prohibited by OCGA § 16-5-91 (a).

I am authorized to state that Chief Judge Ellington and Presiding Judge Miller join in this special concurrence.

BLACKWELL, Judge, concurring in part and dissenting in part.

No one disputes that the evidence at trial is sufficient to prove that Corey Keaton was enjoined to keep away from the home of his estranged wife,[13] that he violated this injunction repeatedly, and that he violated it again on September 12, 1998, when he went to the home and raped his wife. To prove that Keaton committed aggravated stalking in violation of OCGA § 16-5-91 (a), at least according to the clear and unambiguous terms of that statute, the State needed to prove nothing more.[14] But in Division 1 of its opinion, the majority[15] adopts an interpretation of the statute that is inconsistent with the plain meaning of those clear and unambiguous terms and

---

[11] (Emphasis supplied.)

[12] I do not agree with the majority that the dissent's grammatical analysis leads to the absurd result that violation of any injunction (i.e., one prohibiting the construction of a fence that encroaches on a neighbor's property) would satisfy the terms of the aggravated stalking statute.

[13] Keaton was permitted to go to the home to exercise his right of visitation with their children, but there appears to be no contention here that Keaton was visiting his children when he went to the home on September 12, 1998.

[14] There seems to be no dispute in this case that Keaton's course of conduct amounts to a pattern of harassing and intimidating behavior. See *State v. Burke*, 287 Ga. 377, 379 (695 SE2d 649) (2010); *Louisyr v. State*, 307 Ga. App. 724, 728-729 (1) (706 SE2d 114) (2011).

[15] Because the opinion of Judge Adams represents the views of the unanimous Court as to Divisions 2, 3, 4, 5 and 6, I refer to that opinion as the "majority" opinion. I note, however, that no opinion commands a majority of the votes of the Court as to Division 1, although six judges concur in the judgment reversing Keaton's aggravated stalking conviction.

that amounts to nothing less than a judicial rewrite of the statute. Moreover, I think that sufficient evidence supports Keaton's conviction for aggravated stalking even under the misconstruction of the statute adopted in the majority opinion. For both of these reasons, I respectfully dissent from Division 1.[16]

1. I begin with the well-settled principle that, "[i]n all interpretations of statutes, the courts shall look diligently for the intention of the General Assembly." OCGA § 1-3-1 (a). But as our Supreme Court has instructed, the search for legislative intent must begin with the words of the statute, and if those words are clear and unambiguous, the search also must end there. See *Six Flags Over Ga. II v. Kull*, 276 Ga. 210, 211 (576 SE2d 880) (2003) ("Where the language of a statute is plain and unambiguous, judicial construction is not only unnecessary but forbidden."); see also *Opensided MRI of Atlanta v. Chandler*, 287 Ga. 406, 407 (696 SE2d 640) (2010) (When the words of a statute are clear and unambiguous, we must give those words their plain meaning.); *Chase v. State*, 285 Ga. 693, 695 (2) (681 SE2d 116) (2009) ("Where the language of a statute is plain and susceptible to only one natural and reasonable construction, courts must construe the statute accordingly.") (footnote omitted). Put another way, when we consider the meaning of a statute, we must presume that the legislature meant what it said and said what it meant.[17] *Northeast Atlanta Bonding Co. v. State of Ga.*, 308 Ga. App. 573, 577 (1) (707 SE2d 921) (2011). We cannot "substitute by judicial interpretation language of [our] own for the clear, unambiguous language

---

[16] I concur fully in the other divisions of the majority opinion.

[17] The majority decries my "undue emphasis" upon the actual text and structure of the statute at issue and instead chooses to focus upon the "legislative purpose behind it," which the majority identifies mostly by reference to a report of an interview with a single legislator. The approach of the majority brings to mind the cautionary words of Justice Nahmias:

> [W]hen judges start discussing not the meaning of the statutes the legislature actually enacted, as determined from the text of those laws, but rather the unexpressed "spirit" or "reason" of the legislation, and the need to make sure the law does not cause "unreasonable . . . consequences," we venture into dangerously undemocratic, unfair, and impractical territory. . . . [T]his approach usually leaves unanswered just how the "intention" of a multi-member legislative body is to be determined, if not from the text of the laws that it actually passed. The legislative history of a statute and the debates regarding it, along with many other sources like contemporary dictionaries and prior use of terms in statutes and cases, may help us to understand the meaning of the various terms used in the final text on which the legislature voted. But how, putting aside the text, are we to figure out what "intention" was in the head of the legislators when they voted? And are we searching for the intention of the entire legislature? A majority of the members who voted? Just the key members or sponsors of the bill or others who spoke or wrote about the bill at some point before (or after) passage, in some way that was publicly reported? What if no majority of members voted on it with the same intention? And what of the intention of the Governor who signed the bill?

*Merritt v. State*, 286 Ga. 650, 656-657 (690 SE2d 835) (2010) (Nahmias, J., concurring).

of the statute, so as to change the meaning." *Frazier v. Southern R. Co.*, 200 Ga. 590, 593 (2) (37 SE2d 774) (1946). See also *Anthony v. American Gen. Financial Svcs.*, 287 Ga. 448, 450 (1) (a) (697 SE2d 166) (2010) ("It is not the place of this Court to rewrite statutes. . . .").

With these principles in mind, I turn to OCGA § 16-5-91 (a), which defines the offense of aggravated stalking as follows:

> A person commits the offense of aggravated stalking when such person, in violation of a bond to keep the peace posted pursuant to Code Section 17-6-110, temporary restraining order, temporary protective order, permanent restraining order, permanent protective order, preliminary injunction, good behavior bond, or permanent injunction or condition of pretrial release, condition of probation, or condition of parole in effect prohibiting the behavior described in this subsection, follows, places under surveillance, or contacts another person at or about a place or places without the consent of the other person for the purpose of harassing and intimidating the other person.

For the violation of an injunction to amount to aggravated stalking, the majority opinion says, the injunction must be one "in effect prohibiting the behavior described in [OCGA § 16-5-91 (a)]," which is, of course, "follow[ing], plac[ing] under surveillance, or contact-[ing] another person at or about a place or places without consent of the other person for the purpose of harassing and intimidating the other person."[18] The majority, I think, simply misreads the statute.

Contrary to the interpretation of the majority, the clear and unambiguous words of the statute quite plainly do not require an injunction "in effect prohibiting the behavior described in [OCGA § 16-5-91 (a)]." The statute begins with two distinct lists of decrees, the violation of which may amount to aggravated stalking. The first list consists of a "bond to keep the peace posted pursuant to Code Section 17-6-110, temporary restraining order, temporary protective order, permanent restraining order, permanent protective order, preliminary injunction, good behavior bond, or permanent injunction," and the use of the disjunctive "or" immediately preceding the reference to "permanent injunction" indicates the conclusion of this

---

[18] The majority opinion says that it always has been understood that aggravated stalking requires a violation of an injunction or other predicate decree that "in effect prohibit[s] the behavior described in [OCGA § 16-5-91 (a)]." But the only supports that the majority offers for this proposition are a law review article and some passing references in judicial opinions that, as the majority admits, did not even purport to address the issue presented here.

first list. "Permanent injunction" is followed by another disjunctive "or," which signals a second, distinct list. And the second list consists of a "condition of pretrial release, condition of probation, or condition of parole." The qualifying adjective phrase at issue in this case — "in effect prohibiting the behavior described in [OCGA § 16-5-91 (a)]" — follows immediately after the second list. While the majority concludes that the qualifying phrase applies to both lists, such a construction conflicts with the rules of grammar and renders meaningless the statute's division of predicate decrees into two distinct lists.

According to the rule of the last antecedent, which is an accepted convention of English grammar, "a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Barnhart v. Thomas*, 540 U. S. 20, 26 (II) (124 SC 376, 157 LE2d 333) (2003). See also 2A N. Singer, Statutes and Statutory Construction, § 47:33, p. 369 (6th ed. 2000) ("Referential and qualifying words and phrases, where no contrary intention appears, refer solely to the last antecedent."). The United States Supreme Court has observed that "construing a statute in accord with the rule is 'quite sensible as a matter of grammar,' " *Barnhart*, 540 U. S. at 26 (II) (citation omitted), and the rule is, in fact, routinely applied by courts in the interpretation of statutes. See, e.g., *Jama v. Immigration &c. Enforcement*, 543 U. S. 335, 342-345 (II) (A) (125 SC 694, 160 LE2d 708) (2005); *Allard K. Lowenstein &c. Project v. Dept. of Homeland Security*, 626 F3d 678, 681 (2d Cir. 2010); *Judge v. Quinn*, 612 F3d 537, 550 (2) (c) (7th Cir. 2010); *Carroll v. Sanders*, 551 F3d 397, 399 (II) (6th Cir. 2008); *United States v. Park*, 536 F3d 1058, 1063 (II) (A) (9th Cir. 2008); *American Gen. Finance v. Paschen*, 296 F3d 1203, 1209 (III) (11th Cir. 2002). The last antecedent of "in effect prohibiting the behavior described in [OCGA § 16-5-91 (a)]" is the second list, "condition of pretrial release, condition of probation, or condition of parole."[19]

It is true that the rule of the last antecedent "is not an absolute and can assuredly be overcome by other indicia of meaning," *Barnhart*, 540 U. S. at 26 (II), but no contrary indicia of meaning appear in OCGA § 16-5-91 (a) that suggest the qualifying adjective phrase should apply to the first list. Instead, the other indicia of meaning confirm that applying the qualifier to the first list would misconstrue the statute. The General Assembly elected to separate

---

[19] It could be said, of course, that only "condition of parole" is the last antecedent of the qualifying phrase. But as the United States Supreme Court has acknowledged, a qualifying phrase may apply to all the parts of a "single, integrated list" that immediately precedes the qualifying phrase, consistent with the rule of the last antecedent. See *Jama*, 543 U. S. at 344 (II) (A), n. 4. The second list in OCGA § 16-5-91 (a) is a "single, integrated list."

the predicate decrees in OCGA § 16-5-91 (a) into two distinct lists, and I cannot conceive of what purpose the separation might serve, other than to make clear that the qualifying adjective phrase applies to the second list and not to the first. The majority, in fact, does not even attempt to offer an alternative explanation of the separation,[20] presumably because there is no other plausible explanation. If the qualifier applied to all the predicate decrees, there would have been no reason whatsoever to divide the decrees into two lists, and the statute would have been written more simply, with a single, integrated list of predicate decrees.

To apply the rule of the last antecedent is to honor the choice of the General Assembly to precede and follow the term "permanent injunction" with the disjunctive "or," rather than a mere comma. To read the statute as the majority does is to reject that choice and twice replace the disjunctive "or" with a comma.[21] Because we cannot properly rewrite an enactment of the General Assembly, we must, I think, give effect to this choice and construe the qualifier at issue — "in effect prohibiting the behavior described in [OCGA § 16-5-91 (a)]"

---

[20] The special concurrence attempts to explain the separation, but its explanation is no more convincing than the silence of the majority. According to the concurring opinion, the predicate decrees in the first list must specifically prohibit stalking, whereas those in the second list need only effectively prohibit it. That is, rather than just read a couple of disjunctives out of the statute as the majority does, the special concurrence would read an entirely new requirement into it. This is "statutory construction" in a literal sense: we are not construing a statute but making a new one.

[21] We will not follow the literal language of a statute if it leads us to an absurd conclusion, *In the Interest of D. H.*, 285 Ga. 51, 54 (3) (673 SE2d 191) (2009), but it is not absurd to give meaning to the General Assembly's decision to include two lists of predicate decrees with a qualifying adjective phrase that applies only to the second list. I do not know why the General Assembly drafted the statute in this way, but I can conceive of at least one possibility. Conditions of pretrial release, conditions of probation, and conditions of parole sometimes include broad prohibitions that have rehabilitative (or, in the case of conditions of probation, punitive) purposes and are unrelated to any protective purpose. For instance, these conditions frequently include a prohibition of the consumption of alcoholic beverages. Perhaps the General Assembly thought that a stalker ought not be subjected to punishment as a felon simply because he was consuming a beer as he was stalking his victim, in violation of a condition of pretrial release, condition of probation, or condition of parole. The decrees identified in the first list, on the other hand, issue only upon a showing that they are reasonably necessary to protect some other person from harm, whether harm to their person, their property, or some other cognizable interest. See, e.g., OCGA §§ 9-11-65 (b) (1) (temporary restraining order issued only upon showing "that immediate and irreparable injury, loss, or damage will result to the applicant"); 16-5-94 (c) (temporary stalking protective order issued "to protect the petitioner or a minor of the household from stalking" and only upon showing "that stalking by the respondent has occurred in the past and may occur in the future"); 17-6-110 (a) (bond to keep peace issued only "[u]pon the information of any person, under oath, that he is in fear of bodily harm to himself or his family, or of violent injury to his property from another person"); 19-13-3 (b) (temporary family violence protective order issued "to protect the petitioner or a minor of the household from violence" and only upon showing "that family violence has occurred in the past and may occur in the future"); *Danbert v. North Ga. Land Ventures*, 287 Ga. 495, 498 (2) (697 SE2d 204) (2010) (injunctive relief requires showing of irreparable harm).

— as applying only to a "condition of pretrial release, condition of probation, or condition of parole." Because this qualifier simply does not apply to an injunction, the injunction that Keaton violated when he went to the home of his estranged wife and raped her properly forms the basis for an aggravated stalking conviction, regardless of whether the injunction is one "in effect prohibiting the behavior described in [OCGA § 16-5-91 (a)]."

2. In any event, even if the General Assembly had provided in the statute that a person commits aggravated stalking only if he violates an injunction (or one of the other predicate decrees in the first list) that "in effect prohibit[s] the behavior described in [OCGA § 16-5-91 (a)]," it would be wrong to conclude that the injunction in this case is not such an injunction. It is true that the injunction in this case — which enjoined Keaton from "going to [his estranged wife's] home except to exercise his visitation rights with the children of the parties" — did not use the precise words found in OCGA § 16-5-91 (a): "follow[ing], plac[ing] under surveillance, or contact-[ing] another person at or about a place." But to require those or similar words to appear in such an order would elevate form over substance. Moreover, it would ignore the command that the order need only "in effect prohibit[ ]" such conduct.[22] And it would be inconsistent with cases in which we have affirmed convictions for aggravated stalking, based on a violation of an order that merely required the defendant to keep away from the location of the victim, without any reference to "follow[ing], plac[ing] under surveillance, or contact[ing]" the victim. See, e.g., *Ford v. State*, 283 Ga. App. 460, 461 (1) (641 SE2d 671) (2007) (defendant enjoined "from approaching within 100 yards of (his wife) and/or the minor children of [his wife]") (punctuation omitted).

Although the injunction that Keaton violated does so only implicitly, it "in effect prohibit[ed]" Keaton from having a certain kind of contact with his estranged wife at or about a specific place. Under the terms of the order, he could not have in-person, face-to-face contact with his wife at their home — unless, of course, he were exercising his right of visitation with their children at the time — without violating the order. That the order does not "in effect

---

[22] One might wonder whether "in effect," as those words are used in the statute, means that the decree that is violated must be effective at the time of the violation. But because it is nonsense to say that an order can be violated at a time when it is not effective, such a construction would render "in effect" mere surplusage. Moreover, if "in effect" were intended to mean that the decree must be effective at the time of the violation, a qualification distinct and separate from the qualification that the decree must be one "prohibiting the behavior described in [OCGA § 16-5-91 (a)]," surely the General Assembly would have instead written "in effect *and* prohibiting the behavior described in [OCGA § 16-5-91 (a)]." "[I]n effect" is more reasonably understood, I think, to mean "effectively."

prohibit[ ]'' *all* contact with Keaton does not mean that it is not an order "in effect prohibiting the behavior described in [OCGA § 16-5-91 (a)]." The majority opinion makes much of the fact that the injunction did not prohibit Keaton from telephoning his estranged wife or otherwise contacting his wife, so long as he did not go to her home. But in the very cases cited in the majority opinion, we affirmed aggravated stalking convictions, notwithstanding that the orders on which the convictions were premised allowed some forms of contact. See, e.g., *Bray v. State*, 294 Ga. App. 562, 562-563 (1) (669 SE2d 509) (2008) (order permitted defendant to telephone home of victim to have phone visitation with children); *Ford*, 283 Ga. App. at 460-461 (1) (order permitted defendant to come within 100 yards of wife "during exercise of visitation [with his children]").

In the end, the majority seems to focus most on the purpose of the injunction, which, the majority apparently perceives, was merely to keep Keaton away from the marital home, not to keep him away from the victim. That might well have been the purpose of the injunction, but its purpose has nothing to do with whether a violation of it can give rise to an aggravated stalking charge. The qualifying adjective phrase at issue does not focus on the purpose of the order; it focuses on its effect. See OCGA § 16-5-91 (a) ("in effect prohibiting the behavior described in this subsection"). To require that a predicate decree have been issued with a specific purpose is to rewrite the statute to promote policies that are expressed nowhere in the statute. Because we ought not do such a thing, see *Anthony*, 287 Ga. at 450 (1) (a), I respectfully dissent.

DECIDED JULY 14, 2011.

*McGee & McGee, James B. McGee III*, for appellant.
*Richard E. Currie, District Attorney, Michelle C. McIntire, Assistant District Attorney*, for appellee.